HANNAH B., Appellant,

v.

STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, Appellee.

No. S–14565.

Supreme Court of Alaska.

Dec. 10, 2012.

Marjorie K. Allard, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant.

Megan R. Webb, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice, CARPENETI, WINFREE, and STOWERS, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

A mother appeals the termination of her parental rights to her young son. The mother has a long history of substance abuse and relinquished parental rights to her older daughter in 2008 because she was unable to care for her. During the 18 months following the child's removal, the mother continued to abuse drugs until she was incarcerated. At that point, she entered an intensive residential substance abuse program at the prison, which she successfully completed two weeks prior to the termination trial. In appealing the superior court's order terminating her parental rights, the mother argues that the court erroneously (1) denied her motion to continue the termination proceedings; (2) determined that termination was in the best interests of the child; and (3) failed to consider legal guardianship as an alternative to termination. Because we find no reversible error, we affirm the decision of the superior court.

## II. FACTS AND PROCEEDINGS

### A. Facts

Hannah B. is the mother of four-year-old Jacob.[1] Jacob was born in March 2008 and lived with his mother until he was 16 months old; he was removed from his mother's care by the Office of Children's Services (OCS) when Hannah was arrested for an outstanding warrant in July 2009. Upon removal, Jacob was placed with his maternal grandmother, Carla, and has remained in her care. Carla also has custody of Hannah's older child, Jordanne, who is 13 years old. Hannah relinquished her parental rights to Jordanne in 2008.

### 1. Hannah's substance abuse and treatment history and prior OCS case

Hannah has a significant history of substance abuse. She began using marijuana, methamphetamine, and alcohol as a teenager. In May 1999, at the age of 19, Hannah gave birth to a daughter, Jordanne. In 2000 or 2001, Jordanne was taken into OCS custody because Hannah was growing marijuana.[2] During the period between Jordanne's initial removal and 2005, Hannah participated in at least two residential treatment programs for substance abuse.[3] But these rehabilitation efforts were ultimately unsuccessful. Jordanne was intermittently returned to her

---

**1.** We use pseudonyms to protect the family's privacy.

**2.** Hannah testified that Jordanne was taken into OCS custody in 2000. But court records indicate that the marijuana grow was discovered on May 31, 2001.

**3.** The record contains conflicting evidence regarding the dates and the number of substance abuse treatment programs that Hannah engaged in between 2000 and 2005. But there is ample evidence to support the superior court's finding that Hannah participated in at least two residential treatment programs during this period.

mother's care between treatment attempts, but Hannah was unable to maintain her sobriety outside of residential treatment and soon returned to using drugs. After Hannah's relapse in 2005, Jordanne remained in state custody for more than four years before Hannah relinquished her parental rights in 2008 and Jordanne was formally adopted by Carla in 2009.

### 2. Hannah's OCS case with Jacob

In March 2008, Hannah gave birth to Jacob; he spent most of the first 16 months of his life with Hannah.[4] In July 2009, Hannah was arrested on an outstanding warrant. She was later charged with several drug-related offenses. At this time, OCS assumed custody of Jacob and initiated a child in need of aid case. Like his sister, Jordanne, Jacob was also placed with his maternal grandmother, Carla. OCS created a new case plan for Hannah, which required her to complete substance abuse treatment, obtain a mental health evaluation, take parenting classes, and pass random urinalysis tests. Hannah was permitted to visit Jacob at Carla's home, but Carla would not allow Hannah to visit if she had been using drugs. Hannah testified that she would use during the week and then "clean up" for weekend visits.

Hannah complied with portions of her OCS case plan, but failed to follow through with recommendations and substance abuse treatment. In November 2009, Hannah completed a substance abuse evaluation and a mental health evaluation. Her substance abuse assessment recommended that Hannah participate in an intensive, structured, outpatient substance abuse program, followed by a six-month aftercare program. Dr. Grace Long, who conducted Hannah's mental health evaluation, diagnosed Hannah with depression, and she recommended a follow-up evaluation once Hannah had been sober for a minimum of six to eight months.

Hannah failed to follow through on these recommendations and dropped out of contact with OCS. For the 18-month period between

Jacob's removal and Hannah's incarceration—aside from a three-day detox in March 2010—Hannah continued to use drugs. Her visitation record with Jacob during this period is unclear. Hannah and Carla both testified that Hannah maintained fairly regular visitation with Jacob on weekends during this period, other than a period of about six weeks when Carla denied visits because Hannah had been using drugs. But according to Raymond Edwards, an OCS caseworker, Hannah was out of contact with Carla for longer periods of time because Hannah was using drugs. The superior court found that Hannah "wasn't getting a lot of visits with Jacob [during the 18-month period] because she was using heavily." Edwards testified that he had limited contact with Hannah during the summer of 2010, and his repeated attempts to get in touch with Hannah after that were unsuccessful until December 2010.

In December 2010, Hannah entered a change of plea on her outstanding charges. All felony drug charges were dismissed, and Hannah pleaded to one count of felony failure to appear, for which she received a sentence of one year. Soon after her remand into custody, Hannah was transported to Hiland Mountain Correctional Center, where she entered the Residential Substance Abuse Treatment (RSAT) program on February 1, 2011.

### 3. Hannah's participation in the RSAT program

The RSAT program is an intensive, substance abuse treatment program that takes between six and nine months to complete. Program participants are housed separately from the general inmate population and are under 24-hour supervision by treatment staff, correctional staff, and program peers. Participants receive individual and group counseling and are subject to random urinalysis tests. All of Hannah's urinalysis tests during the eight months she was enrolled in the program were clean. The program requires participants to complete programs in

---

4. During this period Hannah was arrested and served jail time for driving with a suspended license. Jacob's father played little role in his son's life. His parental rights were ultimately terminated on the grounds of abandonment at the same proceeding at which Hannah's rights were terminated. The father does not appeal the termination of his parental rights.

parenting, grief and loss, drug and alcohol addiction, and criminal attitudes; they must also obtain their GED.

The RSAT program treats only the most seriously addicted offenders with lengthy criminal histories and has a particular focus on parenting skills. A trained social worker, Judy Jacob, serves as liaison between women in the program and OCS. According to the Department of Corrections, many women win back parenting rights after completing the program.

Hannah maintained regular visitation with Jacob during her incarceration. OCS arranged visits twice a month, and Carla brought Jacob for a visit once a month. In September 2011 Hannah successfully completed the RSAT program, graduating a week before her release from prison. She voluntarily entered Dena A Coy residential treatment program upon her release from Hiland, in compliance with RSAT staff recommendations.

### B. Proceedings

OCS is ordinarily required to file a petition to terminate parental rights once a child in need of aid has been in foster care for at least 15 of the most recent 22 months; an exception exists if OCS documents a compelling reason for determining that filing the petition would not be in the best interests of the child.[5] OCS initially determined there was a compelling reason not to file a termination petition in this case, based on Jacob's placement with his grandmother and the "good bonding relationship" between Hannah and Jacob.[6] By October 2010, though, OCS was pursuing a permanency goal of adoption, which the superior court approved at a permanency hearing that month.[7] OCS filed a petition for termination of parental rights in February 2011.

In August 2011, shortly before trial was scheduled, Hannah's attorney filed a motion to strike the petition or continue the termination proceedings.[8] The bases for the continuance motion are set out below in Part IV.A. The superior court denied both requests in a summary order. Hannah's attorney then filed an interlocutory petition for review with this court, which we denied.

The termination trial actually occurred on October 4, 2011. Five witnesses testified at trial: Two OCS case workers were called by the State; Hannah, Carla, and RSAT social worker Judy Jacob testified on Hannah's behalf.

At the time of the trial, Hannah was in the orientation phase of treatment at Dena A Coy and had not yet entered the program phase. Jacob had been in OCS custody for 26 months and was three-and-a-half years old.

Hannah anticipated remaining in residential treatment until February 2012, when she would transfer into an intensive outpatient aftercare program, and she had identified a place to stay upon her release. She testified that OCS would likely need her to demonstrate at least a year of sobriety before Jacob could be placed with her. Hannah acknowledged that she had several triggers for drug use and that she feared relapse because of her prior pattern of relapse. But she also testified that "she wasn't serious about treatment in the past," and that she had learned coping skills in the RSAT program, was "a lot more responsible today," and wanted to be a good mother.

OCS social worker Edwards testified that Hannah had not made adequate changes within a reasonable time. Although aware of Hannah's progress in the RSAT program, which he described as a good program, Ed-

---

**5.** *See* AS 47.10.088(d)-(e). A compelling reason may include care by a relative for the child. *Id.* at (e).

**6.** This compelling reason is documented in Hannah's September 2010 case plan, dated September 29, 2010.

**7.** There is some confusion surrounding how and when OCS's view on this matter changed. At trial, Edwards testified that the September 29 case plan may have been drafted at an earlier time, because the effective date is the date of supervisor approval. He further testified that the compelling reason appeared to be "leftover" from the previous case plan, as he did not recall writing it.

**8.** Trial had been set for August 16, 2011, at the June 2011 permanency hearing.

wards testified that "the real test" does not occur until an individual is on his or her own. He noted that Hannah had a pattern of doing well while in a residential structured program but that "she's never been sober outside of jail," and that there was a high risk of relapse. Edwards testified that given her history, Hannah would need to complete residential treatment and demonstrate sobriety outside of a controlled environment for at least a year before Jacob could be put in her care. But Edwards stated that Jacob needed permanency now, in the form of permanent adoption by Carla. He testified that it would not be in Jacob's best interest to be removed from Carla and that removal would likely be "quite traumatic." Edwards also asserted that Carla's house was "home" to Jacob, that Jacob viewed Carla as his "mom" and as his primary caregiver, and that Jacob's "primary bond" was with Carla.

Carla, on the other hand, supported reunification between Hannah and Jacob. She testified that there was a "big difference" in Hannah since she had entered the RSAT program and that Hannah was thinking about things in a "totally different" way than she had in the past, during other treatment attempts. According to Carla, the RSAT program had "do[ne] wonders" and she believed the changes in Hannah were permanent.[9] Carla also testified that Jacob knows Hannah as his mother, and that there was a "very strong" bond between Hannah and Jacob.

The RSAT social worker also testified on Hannah's behalf in favor of reunification. The social worker does not advocate for every mother who completes the RSAT program, but she felt Hannah deserved advocacy because of her consistency, focus, and progress. The social worker testified that

Hannah was "committed to doing everything she [could] ... to be reunified with her son."

The superior court granted the termination petition. The court found by clear and convincing evidence that (1) Jacob continued to be a child in need of aid under AS 47.10.011(10) (substance abuse); (2) Hannah had failed to make substantial progress to remedy her conduct due to her continued need for residential treatment; (3) OCS had made reasonable efforts to reunify Hannah and Jacob; and (4) termination was in Jacob's best interests.

While the court acknowledged Hannah's "very important" efforts in the RSAT program and her "beginning efforts" at Dena A Coy, it balanced this with her near total lack of progress before her incarceration. The court noted that at the time Hannah entered the RSAT program, Jacob had been in out-of-home placement in excess of 18 months. And during this 18-month period, the court found that Hannah was continuing to use drugs and hiding from her parole officer instead of working on her case plan. The court concluded that Hannah had failed to make substantial progress toward remedying the conduct or conditions that caused Jacob to be a child in need of aid.[10]

The court characterized the RSAT social worker's advocacy for reunification as "uninformed" because she was "unaware of Hannah's relapse history after two prior residential programs." It also found that the social worker was not advocating for Jacob's best interests but rather for the mother's best interests. The court balanced Carla's testimony regarding the change in Hannah with Edwards's testimony. It relied on Edwards's statement that Carla's opinion of Hannah and what should happen with Jacob changed in correlation to how Hannah was progressing at the time.[11] The court also

---

**9.** When asked whether she thought Hannah would "mess up again," Carla responded: "No, I really don't think so, not this time."

**10.** The court noted that even had Hannah completed the case plan (residential treatment followed by a period of outpatient treatment, followed by a period of aftercare), there would still be an open question as to whether Hannah had made substantial progress, given Hannah's "history ... of voluntarily engaging in residential

treatment, twice in the past, and failing once she left the residential component of treatment and being unsuccessful in an out-patient or aftercare setting."

**11.** The court found that "[w]hen Hannah is doing well the grandmother advocates for Jacob returning to his mother. When Hannah is not doing well ... the grandmother advocates for a quick adoption so that Jacob can be taken care of."

emphasized that Carla "hoped," rather than "knew," that the changes in Hannah were real.

In its best-interests analysis, the court stated that "what this argument boils down to is the question of bonding." It found that the most important window for a child to form primary attachments and for development is between 18 and 36 months, and that Hannah had been absent during this critical period due to her drug use. It further found that Jacob's primary bond was with his grandmother. Thus, the court concluded that the best interests of the child would be promoted by terminating Hannah's parental rights.

Hannah's attorney moved for reconsideration, arguing that termination was contrary to the legislature's intent that all Child in Need of Aid (CINA) laws be liberally construed to strengthen families and that the superior court should have considered alternatives to termination, such as guardianship or releasing Jacob to the grandmother under OCS supervision. The superior court denied the motion in a summary order. This appeal followed.

## III.   STANDARD OF REVIEW

We review a denial of a motion to continue for "abuse of discretion, determining whether a party has been deprived of a substantial right or seriously prejudiced by the lower court's ruling." [12] In CINA cases, we review a superior court's findings of fact for clear error.[13] Best-interests determinations are factual findings that are reviewed under a clearly erroneous standard.[14] Findings are clearly erroneous only if the court is

left with "a definite and firm conviction that a mistake has been made." [15] Generally, conflicting evidence is insufficient to overturn the superior court's decision, and we will not reweigh evidence when the record provides clear support for the superior court's ruling.[16] We defer to a superior court's credibility determinations, particularly when they are based on oral testimony.[17]

Whether the superior court's findings are consistent with the CINA statutes is a question of law that we review de novo, adopting "the rule of law that is most persuasive in light of precedent, reason, and policy." [18] In reviewing a superior court's decision terminating a parent's rights, we "bear in mind at all times that terminating parental rights is a drastic measure." [19]

## IV.   DISCUSSION

### A.   The Superior Court Did Not Abuse Its Discretion In Denying The Motion To Continue.

Hannah argues that the court abused its discretion in denying her request for a continuance. She argues that there was good cause to continue the trial given that Jacob was in a stable placement with Carla, Hannah was making good progress in treatment, and Carla opposed termination of Hannah's rights. She asserts that there was inadequate information to make a decision at the time regarding Hannah's recovery or Jacob's long-term best interests and that a lengthy continuance would not have had an adverse effect on Jacob because he was too young to understand the legal implications and he was part of a larger, family-care structure.

12.   *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1018 (Alaska 2009).

13.   *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1103 (Alaska 2011).

14.   *Id.* at 1104.

15.   *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008) (quoting *Brynna B. v. State, Dep't of Health & Soc. Servs.*, 88 P.3d 527, 529 (Alaska 2004)).

16.   *Id.*

17.   *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 274 (Alaska 2011).

18.   *Tessa M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 182 P.3d 1110, 1114 (Alaska 2008) (quoting *Brynna B.*, 88 P.3d at 529).

19.   *Christina J.*, 254 P.3d at 1104 (quoting *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 53 (Alaska 2003)).

■ The original trial date in this case was August 16, 2011. Because OCS filed the termination petition on February 17, 2011, the court was required to hold the trial by August 17, 2011, unless it found good cause to continue.[20] In August 2011, shortly before trial, Hannah filed a motion to strike the petition [21] or, alternatively, continue the termination proceedings for good cause. She argued that good cause existed to continue the termination proceedings because Hannah had a good relationship with Jacob, she was actively engaged in treatment, and Jacob was unlikely to suffer adverse effects from delay due to his young age and stable placement with his grandmother. The State opposed the motion, arguing that (1) Hannah had failed to pursue treatment prior to her incarceration and still had a significant amount of treatment remaining; (2) Hannah had a history of relapse following substance abuse treatment; (3) OCS had determined that there was no compelling reason to delay filing the termination petition; and (4) Jacob needed permanency now. The guardian ad litem also opposed the motion, arguing there was no good cause to continue the termination trial because Hannah had not remedied her conduct in a timely manner and Jacob needed permanency. The superior court summarily denied the motion to strike or continue.

■ To show that the court abused its discretion, Hannah must show that she was "deprived of a substantial right" or that she was "seriously prejudiced by the denial of a continuance."[22] Hannah contends that the superior court's denial of the motion to continue substantially prejudiced her ability at the termination trial "to make a reasoned and well-informed presentation regarding what was likely to be the progression of Jacob's life and likely to be in Jacob's long-term best interests."[23] In response, the State points out that Hannah only requested a three-month continuance,[24] which—given the ultimate postponement of the trial [25]— would not have materially altered Hannah's ability to present her case at trial, even if granted. We agree with the State.

The trial was delayed for seven weeks and ultimately occurred in October.[26] There is no reason to believe Hannah's situation would have been substantively different had she been given an additional five weeks to demonstrate her sobriety. At trial, the superior court considered Hannah's plea for additional time to demonstrate sobriety; and it concluded that even had the termination trial been delayed several additional months to allow Hannah to complete residential treatment, the court still could not have found that Hannah had remedied her behavior. The superior court explained that this was so because of Hannah's "prior history of voluntarily engaging in treatment and subsequently failing to maintain her sobriety for a significant period of time," which created substantial uncertainty whether she would

20. *See* AS 47.10.088(j) (providing that the court "shall hold a trial on the petition [no later than six months after the termination petition is filed] unless the court finds that good cause is shown for a continuance").

21. Although Hannah asserts that the court erred by failing to strike the termination petition in her statement of points on appeal, she does not brief the issue. We therefore decline to address it here. *See Sengul v. CMS Franklin, Inc.,* 265 P.3d 320, 330 & n. 41 (Alaska 2011).

22. *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 204 P.3d 1013, 1019 (Alaska 2009).

23. The State asserts these arguments are waived because they were not made before the trial court, but we do not agree. Hannah's motion to continue essentially argued that given her progress in treatment and her bond with Jacob, a continuation was warranted because it would not be in Jacob's best interests to terminate parental rights. This is consistent with the argument she now makes regarding Jacob's long-term best interests.

24. In her motion to continue, Hannah did not specify the length of continuance desired; however, she did reference attempts to negotiate a three-month continuance to allow Hannah to enter residential treatment and "demonstrate continued sobriety outside of a jail setting." We therefore interpret her motion as a request for a continuance of three months.

25. The trial was originally scheduled for August 16, 2011, but was not held until October 4, 2011.

26. The superior court granted Hannah's request for a stay of the termination trial pending our resolution of her interlocutory petition for review.

be able to maintain her sobriety in the future. The court also properly considered the effect of delay on Jacob;[27] it concluded that such a delay would not be in Jacob's best interests, given his age and the length of time he had spent out of the home.

Because a continuance of a few months would not have addressed the court's concerns regarding the likelihood that Hannah would relapse, the denial of the continuance did not seriously prejudice Hannah's ability to make her case at trial.[28] In light of Hannah's pattern of relapse following treatment, the superior court had a strong basis to conclude that a few months of additional time would not have been sufficient for Hannah to show that she had truly remedied her conduct; and "we have emphasized that CINA cases are very time-sensitive."[29] Thus, we conclude that the superior court did not abuse its discretion in denying Hannah's motion to continue.

### B. The Superior Court Did Not Err In Finding That Termination Was In The Best Interests Of The Child.

▆▆▆▆ Before terminating parental rights, a superior court must find termination to be in the child's best interests by a preponderance of the evidence.[30] We review such a finding for clear error.[31] "In a termination trial the best interests of the child, not those of the parents, are paramount."[32] A superior court may consider any fact relating to the best interests of the child in its best-interests analysis.[33]

#### 1. The superior court did not err as a matter of law.

▆▆▆▆ Hannah asserts that the superior court erred as a matter of law by focusing on the issue of bonding in its best-interests analysis. She maintains that there is a fundamental difference between CINA cases where the child is in stranger foster care and CINA cases where the child is placed with a relative. Therefore, she argues, the superior court should have considered factors that are more relevant to a relative placement than factors relevant to a stranger placement.[34] This argument is without merit. Under AS 47.10.088,[35] a superior court may consider "any fact relating to the best interests of the child" in its best-interests analysis; and we

---

27. When determining whether to grant a continuance for good cause, the court is required to take into consideration "the age of the child and the potential adverse effect that the delay may have on the child." AS 47.10.088(j); *see also* AS 47.05.065(5) (finding that children undergo a "critical attachment process" before they reach six years of age, and recognizing that "it is important to provide for an expedited placement procedure to ensure that all children, especially those under the age of six years, who have been removed from their homes are placed in permanent homes expeditiously").

28. Because we conclude that Hannah was not seriously prejudiced by the denial of the continuance, we decline to reach Hannah's argument that the superior court failed to appropriately consider the implications of the relative-based exception to federal timelines in AS 47.10.088(e).

29. *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1019 (Alaska 2009) (citing *S.B. v. State, Dep't of Health & Soc. Servs.*, 61 P.3d 6, 16 (Alaska 2002)).

30. CINA Rule 18(c)(3) (comporting with AS 47.10.088(c)).

31. *Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 850 (Alaska 2009).

32. *Kent V. v. State, Dep't of Health & Soc. Servs.*, 233 P.3d 597, 601 (Alaska 2010) (quoting *A.B. v. State, Dep't of Health & Soc. Servs.*, 7 P.3d 946, 954 (Alaska 2000)).

33. *Doe v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 272 P.3d 1014, 1023 (Alaska 2012) (citing AS 47.10.088(b)).

34. Hannah argues, for example, that the following issues should take predominance in a relative-placement case: whether the relative caregiver thinks termination is in the child's best interests, whether termination is more beneficial than other permanency alternatives such as guardianship, and whether the benefits of termination outweigh the potential harm to the child's existing and future relationship to the parent.

35. AS 47.10.088 provides, in relevant part:

(b) In making a determination under (a)(2) of this section, the court may consider any fact relating to the best interests of the child, including
(1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;
(2) the amount of effort by the parent to remedy the conduct or the conditions in the home;

have recognized that "there is no requirement that superior courts accord a particular weight to any given factor."[36] Hannah fails to cite any legal authority indicating that cases involving the best interests of a child in the care of a relative must be analyzed differently than other cases. And we note that the superior court did consider at least some of Hannah's proposed factors, such as the relative caregiver's opinion and Jacob's future relationship with his mother. Merely because the superior court reached a different conclusion than Hannah desired does not constitute legal error.

## 2. The superior court's finding that termination was in the best interests of the child was not clearly erroneous.

■ Hannah frames her challenge to the superior court's best-interests determination as a claim of legal error, but the cases she cites in support of her position suggest that she also contends that the superior court's factual finding—that termination was in Jacob's best interests—was erroneous. The State maintains that the superior court's finding was amply supported by the evidence and should be affirmed. It argues that the superior court properly focused on Jacob's primary bond with his grandmother and the fact that termination would allow for the achievement of Jacob's permanency goal of adoption.

As the superior court acknowledged, the facts of this case present a difficult decision. Factors weighing against termination includ-

ed Hannah's recent progress in the RSAT program and her beginning efforts at Dena A Coy, as well as Carla's support of Hannah's continued involvement in Jacob's life. We conclude, however, that the superior court's finding that termination was in the best interests of the child was not clearly erroneous. We have repeatedly recognized that the best-interests analysis may include the child's need for permanency at the time of the termination trial;[37] and we have stated that "a child's need for permanence and stability should not be put on hold indefinitely while the child's parents seek to rectify the circumstances that cause their children to be in need of aid."[38]

For example, in *Dashiell R.*,[39] we concluded that it was proper to consider the children's bond to their caregivers, their need for permanency and stability, and the potential risk to the children if returned to their parent's care.[40] The caregivers in *Dashiell R.* were the children's paternal grandparents, who hoped to adopt the children.[41] Unlike the present case, the caregivers in *Dashiell R.* did not support reunification;[42] nonetheless, we think the reasoning in that case is instructive here. In *Dashiell R.*, the father made a similar argument to the one made by Hannah here: He contended that because his children would remain with their paternal grandparents regardless of whether his parental rights were terminated, it was clear error to find that termination was in the children's best interests.[43] We rejected this

(3) the harm caused to the child;
(4) the likelihood that the harmful conduct will continue; and
(5) the history of conduct by or conditions created by the parent.

36. *Doe*, 272 P.3d at 1025 (citing *Barbara P. v. State, Dep't of Health & Soc. Servs.*, 234 P.3d 1245, 1263 (Alaska 2010)) (internal quotation marks omitted).

37. *Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 850–51 (Alaska 2009) (focusing on children's immediate need for permanency despite current placement with grandparents); *see also J.H. v. State, Dep't of Health & Soc. Servs.*, 30 P.3d 79, 87 (Alaska 2001) (holding superior court's determination that child "needed permanence and stability" and therefore termination was in child's best interests was not clearly erroneous,

in case where mother had high risk of returning to substance abuse).

38. *Kent V. v. State, Dep't of Health & Soc. Servs.*, 233 P.3d 597, 603 (Alaska 2010) (citing *J.H.*, 30 P.3d at 87).

39. 222 P.3d 841.

40. *Id.* at 850–51.

41. *Id.* at 845, 850–51.

42. While the grandparents were willing to care for the children even if they were not granted permanent custody, they did not support reunification with the father. *Id.* at 845.

43. *Id.* at 850.

argument, concluding that if the grandparents' care were "only temporary," the children would remain "under the cloud of continuing uncertainty, [and] the children's need for permanence and security would not be met."[44] Similarly, as the superior court found here, it was very uncertain whether Hannah would be able to assume responsibility for Jacob, given the significant amount of treatment remaining and her pattern of relapse following residential treatment. There was also evidence that Jacob had developed a primary bond with his grandmother, as he had been in her care for the majority of his young life. Given these facts, the superior court's finding that termination was in Jacob's best interest was supported by substantial evidence and was not clearly erroneous.

Hannah urges this court to adopt the approach taken by the Arkansas Court of Appeals in a case similar to this one, *Cranford v. Arkansas Department of Human Services.*[45] *Cranford* involved a child's placement with maternal grandparents who, like Carla, were fit relatives willing to adopt, but who intended to continue the parent's involvement in the child's life regardless of any termination order.[46] The parents in *Cranford*, like Hannah, had completed some aspects of their case plans but they were not yet in a position to assume primary caregiving responsibilities for their child.[47] In *Cranford*, the Arkansas Court of Appeals reversed the termination order as clearly erroneous and remanded the case to the lower court to give the parents more time to pursue reunification efforts.[48] The Arkansas appellate court rejected the state's arguments regarding the child's need for "permanency," observing that termination would not necessarily provide greater stability for the child because he was in a potentially permanent placement with his grandparents.[49]

Despite many similarities, *Cranford* is nevertheless distinguishable from this case in important respects. First, there are important factual distinctions between the cases, including the age of the child,[50] the length of time the child had been in out-of-home care,[51] and the absence of lengthy histories of substance abuse on the part of the parents.[52] Second, Arkansas law mandates a higher burden of proof in order to terminate parental rights than Alaska law.[53] Indeed, the *Cranford* court emphasized that while the parents had "exercised extremely poor judgment" in an isolated incident, there was no evidence that either parent had harmed the

---

44. *Id.* at 851. We noted that even if the grandparents would still care for the children if the father retained parental rights, "the children's future would be in flux depending on the ... progress of [their father]." *Id.* Thus, we found the father's argument "unpersuasive because the [superior] court found the need for a permanent, stable relationship now." *Id.* at 850–51.

45. 2011 Ark. App. 211, 378 S.W.3d 851 (2011), *reh'g denied* (Apr. 20, 2011).

46. *Id.* at 855.

47. *Id.* at 853–55.

48. *Id.* at 857.

49. *Id.* The *Cranford* court also noted that because the child was in the custody of relatives, there was "little harm" in allowing the parents more time to pursue reunification. *Id.*

50. The child in *Cranford* was not removed from his parents until he was nearly four years old. *Id.* at 852.

51. The child in *Cranford* had been out of custody for only 15 months at the time of the termination

trial. *Id.* at 852–53. In contrast, Jacob had been out of custody for 26 months at the time of termination, and it was estimated that he would be in out-of-home care for 32–34 months before a trial home visit with Hannah could begin.

52. There is no indication that either of the parents in *Cranford* had long histories of serious substance abuse or patterns of relapse similar to Hannah's. The child's removal was prompted by a traffic accident where the father had been driving while intoxicated; it was discovered that the mother had been drinking as well. But while both parents were ordered to attend a drug and alcohol assessment, no mention is made of whether either parent had a history of substance abuse. *See id.*

53. *Compare* ARK CODE ANN. § 9–27–341(b)(3)(A) (providing that termination order shall be based on finding by clear and convincing evidence that termination is in best interests of the child), *with* CINA Rule 18(c)(3) (providing that the State must prove "by a preponderance of the evidence that termination of parental rights is in the best interests of the child").

child or was a threat to do so in the future.[54]

We think it is reasonable for courts, when making the best-interests determination, to consider placement with a relative as a factor weighing against termination under certain circumstances. But we do not agree that such placement necessarily establishes that termination is clear error, and we decline to so hold in this case. Given Hannah's history of substance abuse and pattern of relapse, the length of time that Jacob had been in out-of-home care, and the evidence regarding Jacob's bond with his grandmother Carla, the superior court's finding that termination was in Jacob's best interests was not clearly erroneous.

### C. Hannah Waived The Argument That The Superior Court Erred In Failing To Order A Guardianship.

▇▇▇▇▇ Hannah argues that the superior court erred in failing to consider legal guardianship as an alternative to termination.[55] Hannah acknowledges that she did not ask the superior court to consider legal guardianship until her post-trial motion for reconsideration. She also recognizes that the arguments before and during trial were focused on the permanency outcomes of termination versus reunification and on allowing Hannah

additional time for reunification efforts. It is well established that arguments raised for the first time in a motion for reconsideration will not be considered on appeal.[56] And in another CINA case, we held that an argument not raised at the termination trial is waived on appeal.[57] Because the question of whether a guardianship would be in Jacob's best interests was not raised or explored at the termination trial, this issue has been waived.[58]

## V. CONCLUSION

Because the superior court did not err in denying the motion to continue or in finding that termination was in Jacob's best interests, and because Hannah waived the argument that the superior court erred in failing to order a guardianship, we AFFIRM the superior court's decision terminating Hannah's parental rights.

MAASSEN, Justice, not participating.

---

54. *Cranford,* 378 S.W.3d at 856. The court was referring to the traffic accident mentioned above.

55. She also appears to argue that the court should have considered the permanent placement of Jacob with a relative as another alternative.

56. *Clemensen v. Providence Alaska Med. Ctr.,* 203 P.3d 1148, 1155 (Alaska 2009) ("[W]e will not consider an issue raised for the first time in a motion for reconsideration.") (citing *Haines v. Cox,* 182 P.3d 1140, 1144 & n. 13 (Alaska 2008)).

57. *See G.C. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 67 P.3d 648, 655 n. 25 (Alaska 2003) (holding issue in termination of parental rights appeal waived because argument was not raised at trial).

58. We note that the case argued on appeal is very different from the case presented to the superior court. For example, Hannah spends a

substantial portion of her brief emphasizing the qualitative difference between children in relative-based foster care and children in stranger-based foster care; and she asserts that these qualitative differences weigh in favor of a different approach to these types of cases. In particular, she argues that permanency considerations are different when the child is placed with a relative, rather than in stranger-foster care, because the child is not "waiting" for a termination order so that he can have a permanent placement with his foster family. While these arguments may have merit, they were not presented to the superior court. Accordingly, we decline to reach them.

Moreover, the superior court is not obligated to sua sponte consider the alternative of guardianship in the context of a termination proceeding. *A.J. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 62 P.3d 609, 614 (Alaska 2003) ("The superior court was not required to consider the less drastic alternative of guardianship in a termination proceeding.").