NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

|  |  |  |
|---|---|---|
| VIOLET B., | ) | |
| | ) | Supreme Court No. S-19016 |
| Appellant, | ) | |
| v. | ) | Superior Court No. 4FA-20- |
| | ) | 00129/00130/00131 CN |
| STATE OF ALASKA, DEPARTMENT | ) | |
| OF FAMILY & COMMUNITY | ) | MEMORANDUM OPINION |
| SERVICES, OFFICE OF CHILDREN'S | ) | AND JUDGMENT[*] |
| SERVICES, | ) | |
| | ) | No. 2071 – February 5, 2025 |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Patricia L. Haines, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant. Jennifer Teitell, Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for Appellee.

Before: Carney, Borghesan, Henderson, and Pate, Justices. [Maassen, Chief Justice, not participating.]

## I. INTRODUCTION

A mother appeals an order terminating parental rights to her three daughters, one of whom is an Indian child. On appeal, the mother argues that the

---

[*] Entered under Alaska Appellate Rule 214.

superior court erred by finding that (1) the Office of Children's Services (OCS) made reasonable and active efforts to reunify the family, (2) the children were likely to suffer serious emotional or physical damage if returned to their mother, and (3) termination of parental rights was in the children's best interests. We observe no errors in the superior court's rulings and affirm the termination order.

## II.    FACTS AND PROCEEDINGS

### A.    Background Facts

Violet B. has three daughters: Simone, Anais, and Sylvie.[1] Each child has a different father, and none of the fathers' rights are at issue in this appeal. Simone, age 14, has Down Syndrome and is non-verbal. Simone has significant special needs that include a special diet, daily medications, and regular doctor and therapist visits. She requires constant supervision, especially when interacting with her younger sisters. Simone has never met her father, M.B., and his parental rights have been terminated.

Anais, age 8, has been diagnosed with attention-deficit/hyperactivity disorder and has speech and language delays. Her father, M.A., is enrolled in an Alaska Native tribe,[2] making Anais an Indian child within the meaning of the Indian Child Welfare Act (ICWA).[3] M.A. has had no relationship with Anais, and his parental rights have been terminated.

Sylvie, age 5, has no identified special needs. Her father is Roman, Violet's husband. Roman has been actively involved in Sylvie's life, but, like Violet,

---

[1]    We use pseudonyms to protect the family's privacy.

[2]    We avoid identifying the particular tribe to protect the family's privacy.

[3]    See 25 U.S.C. § 1903(4) (defining "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe").

he struggles with substance abuse. Following a trial, the superior court terminated Roman's parental rights.

OCS first became involved with Violet's family when the agency took custody of Simone in 2015 based on neglect arising from Violet's substance abuse. Anais was also taken into OCS custody due to neglect shortly after her birth in 2016. Both girls were placed with their maternal grandmother, June H. In 2018, after going through outpatient substance abuse treatment and demonstrating six months of sobriety, Violet regained custody of Simone and Anais. OCS continued to work with the family through 2019, when the case plan expired shortly before Sylvie's birth.

### B. Proceedings

#### 1. Removal and OCS efforts

Based on reports of illegal drug use in Violet and Roman's home, OCS filed a child in need of aid (CINA) petition in September 2020. After a probable cause hearing in October, all three children were determined to be in need of aid because they had suffered or were at risk of suffering substantial physical harm[4] and because they had been subjected to neglect.[5]

Violet and Roman fled with Sylvie after the hearing. OCS was unable to locate either parent or Sylvie until February 2021, at which point Sylvie tested positive for exposure to methamphetamine, heroin, and marijuana. OCS then placed Sylvie with her grandmother, where her two sisters were living. The superior court held an adjudication trial in November and determined that all three children were in need of aid and that OCS should continue to have custody.

For more than a year, OCS continued to update Violet's case plan, set up and pay for urinalysis tests (UAs), and provide referrals to multiple treatment facilities. But Violet missed every UA and, by her own admission, was unwilling to enter

---

[4] AS 47.10.011(6).

[5] AS 47.10.011(9).

treatment. Violet also subsequently admitted that she was actively using methamphetamine during this time. Despite her lack of engagement with OCS on other fronts, Violet consistently attended visits with her children and maintained a strong bond with them.

In October 2022 OCS filed a petition to terminate parental rights, and the superior court scheduled a termination trial. After OCS filed the termination petition, Violet began engaging with OCS for the first time since the children's removal in 2020. In November 2022 Violet and an OCS caseworker updated her case plan, and OCS set up a new referral for a substance abuse assessment. Following the assessment, Violet entered inpatient substance abuse treatment at the Ralph Perdue Center (RPC) in January 2023.[6]

In the first few weeks of her treatment at RPC, Violet tested positive for methamphetamine four times. However, Violet successfully completed inpatient treatment in April. The day following her discharge from RPC, she began outpatient treatment. OCS agreed to postpone the termination trial multiple times because Violet was making significant progress toward sobriety.

Violet graduated from outpatient treatment in late June and moved into her own apartment — without Roman. Throughout the case OCS arranged regular, biweekly visits between Violet and her children. In July OCS revised Violet's case plan with the intent to expand visitation and eventually allow in-home visitation.

Then things began to unravel again for Violet. She failed to show up for a random UA in late July, and subsequently tested positive for methamphetamine twice in August. Following her failed tests, Violet completely disengaged from OCS, and OCS moved forward with the termination trial.

2. **The termination trial**

---

[6] Violet initially began treatment at Restore Inc. in late 2022, but left shortly afterwards. OCS renewed its earlier referral for an assessment at RPC.

At the termination trial in December 2023, OCS's witnesses included a case worker, a tribal cultural expert, an expert in child harm and substance abuse treatment, and the children's maternal grandmother. Violet testified on her own behalf.

The caseworker testified about the various case plans he had prepared for the family and for Violet specifically. He said that Violet's involvement with OCS was "close to zero" following her release from inpatient treatment in April 2023; he described his failed attempts to contact her, both over the phone and in person, throughout the summer and fall of 2023.

Both experts recommended termination, citing Violet's history of substance abuse and her inability to demonstrate sustained sobriety.

The court then heard from the children's maternal grandmother, June H., who described each child in detail, including their current needs and abilities. June stated that she and four other adult family members all live together in the same home. June explained that if Violet's rights were terminated, then Violet's sister would adopt Anais and Sylvie, Violet's brother would adopt Simone, and they all would continue residing together. June said that it takes all five adults in the household to care for the girls because "their needs are so varied and so high." Reflecting on the children's poor condition when they were removed from Violet's care in 2020, June stated that she no longer supported their reunification with Violet.

Testifying on her own behalf, Violet described how she canceled an apartment walk-through with the caseworker in August 2023 and could not reach him to reschedule until the beginning of September, at which point he told her about the failed UA tests. Following that conversation, Violet acknowledged that she "shut down" and stopped engaging with OCS. She believed that OCS would no longer work with her toward reunification and became very depressed. According to Violet, Roman moved in with her a couple of months later, even though she knew that Roman had not undergone treatment for his drug abuse. Finally, Violet testified that she was currently

sober and would be willing to re-engage with OCS, though she had not taken any UAs since her failed tests in August.

The superior court issued a lengthy written decision in February 2024 terminating Violet's parental rights.[7]

Violet appeals.

## III.   STANDARD OF REVIEW

Whether OCS made active efforts to prevent the breakup of the family as required by ICWA is a mixed question of fact and law.[8]  "For mixed questions, 'we review factual questions under the clearly erroneous standard and legal questions using our independent judgment.' "[9] Factual findings are clearly erroneous if, after reviewing the record in the light most favorable to the prevailing party, the court is left with a definite and firm conviction that the superior court's decision was mistaken.[10]

---

[7]    After issuing the ruling, the court held the termination order in abeyance, allowing Violet to reconsider voluntarily relinquishing her parental rights with retained privileges.  Violet declined and the court entered the order in March 2024.  On appeal, Violet argues that the court acted improperly by making its final decision "contingent on a subsequent legal decision by the mother."  However, this argument is without merit.  The court fully explained its rulings in writing, including that termination of Violet's parental rights was in the best interests of the children.  The decision to hold the final order in abeyance was simply an acknowledgement of Violet's desire to remain an active part of her daughters' lives.  The finding itself, that termination was in the children's best interests, was not dependent on whether Violet relinquished her parental rights.

[8]    *Dale H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 235 P.3d 203, 210 (Alaska 2010).

[9]    *Violet C. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 1032, 1037 (Alaska 2019) (quoting *Kylie L. v. State Dep't of Health & Soc. Servs., Off. of Child's Servs.*, 407 P.3d 442, 448 (Alaska 2017)).

[10]    *Maisy W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263, 1267 (Alaska 2008).

Whether the superior court's findings satisfy the requirements of ICWA and our CINA statutes is a legal question.[11] Whether a child will likely suffer harm if returned to a parent's custody and whether termination of parental rights is in the child's best interests are factual determinations.[12]

## IV. DISCUSSION

### A. The Superior Court Did Not Err By Determining That OCS Made Active And Reasonable Efforts Toward Family Reunification.

Before a court may terminate parental rights, it must find that OCS made timely, reasonable efforts to provide family support services.[13] However, when parental rights to an Indian child are subject to termination proceedings, OCS must make more than reasonable efforts; the efforts must be active.[14] We review these efforts on a case-by-case basis because "no pat formula exists for distinguishing between active

---

[11] *Dale H.*, 235 P.3d at 210 (citing *Carl N. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 102 P.3d 932, 935 (Alaska 2004)).

[12] *Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 270 (Alaska 2011) (citing *Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.,* 234 P.3d 1245, 1253 (Alaska 2010) (likelihood of harm if returned to parent); *Dashiell R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 222 P.3d 841, 850 (Alaska 2009) (child's best interests)).

[13] AS 47.10.086(a). These efforts must include "(l) identify[ing] family support services that will assist the parent or guardian in remedying the conduct or conditions in the home that made the child a child in need of aid" and "(2) actively offer[ing] the parent or guardian, and refer[ring] the parent or guardian to, the services identified under (1) of this subsection." *Id.* "Reasonable efforts" are further defined in AS 47.10.990(29) as "consistent attempts made during a reasonable time period and time-limited services."

[14] 25 U.S.C. § 1912(d) (requiring OCS to establish that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family").

and passive efforts."[15]  "Generally, active efforts require a social worker to take the parent through the steps of the reunification case plan, rather than simply devising a plan and requiring the parent to develop his or her own resources to meet it."[16]  "A parent's demonstrated lack of willingness to participate in treatment may be considered in determining whether the state has taken active efforts."[17]

The superior court determined there was clear and convincing evidence that OCS made active and reasonable efforts toward the reunification of Violet's family, though the heightened standard of active efforts was only necessary with regard to Anais because she is an Indian child within the meaning of ICWA.[18]  Because the court's determination and findings have ample support in the record, we affirm.

OCS made consistent, repeated attempts to help Violet work toward reunification, despite her lack of engagement.  OCS continued to set up and pay for UAs, though Violet did not attend a single appointment from October 2020 to January 2023.  OCS continued to maintain and update case plans, including at least two for the family and three specifically for Violet.  OCS prepared referrals for Violet to attend parenting courses through a resource center.  And OCS set up referrals for substance abuse assessments and treatment at multiple facilities.

---

[15]    *A.A. v. State, Dep't of Fam. & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999) (internal quotation marks omitted) (quoting *A.M. v. State*, 945 P.2d 296, 306 (Alaska 1997)).

[16]    *Christopher C. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 303 P.3d 465, 476 (Alaska 2013).

[17]    *N.A. v. State, Div. of Fam. & Youth Servs.*, 19 P.3d 597, 603 (Alaska 2001).  We have clarified, however, that while the cooperation of the parent may be considered, "the analysis of active efforts under ICWA turns primarily on OCS's actions, not on the parent's response." *Mona J. v. Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 553, 562 (Alaska 2022).

[18]    25 U.S.C. § 1903(4).

Immediately after completing outpatient treatment in June 2023, Violet missed one drug test and failed the next two. Once the caseworker told Violet about her failed drug tests in August, Violet ceased all contact with OCS, despite the caseworker's continued attempts to contact her.

OCS also made active efforts to meet the needs of the children by placing them in a first-tier ICWA placement with their maternal grandmother.[19] The children have remained together there, since October 2020 for Simone and Anais, and since February 2021 for Sylvie. In this placement, the children's needs have been met: Simone has received regular medical treatment, therapy, and services through an after-school care provider, and both Anais and Sylvie received educational and disability services through a nonprofit agency.

Finally, OCS facilitated regular visits between Violet and the children since their initial removal in 2020. Violet saw her daughters twice a week, and after noticing that Simone, in particular, benefited from one-on-one time, OCS began staggering the visit times to ensure that Violet received quality time with each child.

OCS's efforts, however, were not perfect. The caseworker acknowledged that he did not immediately set up unsupervised visits once Violet had her own apartment, and that he failed to reply to her text in August 2023, asking to reschedule the apartment walk-through. But OCS's efforts need not be perfect,[20] and there is clear and convincing evidence demonstrating that OCS's efforts were active. Therefore, the superior court did not err by determining that OCS made reasonable and active efforts to reunify Violet with her children.

---

[19]    25 U.S.C. § 1915(b)(i) gives first preference to a placement with "a member of the Indian child's extended family."

[20]    *Audrey H. v. State, Off. of Child.'s Servs.*, 188 P.3d 668, 678 (Alaska 2008); *Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 270 (Alaska 2011).

**B.** **The Superior Court Did Not Clearly Err By Finding That The Children Are Likely To Suffer Serious Harm If Returned To Violet's Care.**

Termination of parental rights under ICWA requires the court to find, beyond a reasonable doubt, that "continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[21] This finding must be supported by expert testimony, which ordinarily must include testimony by a cultural expert,[22] and requires "that (1) the parent's conduct is likely to harm the child and (2) the parent's conduct is unlikely to change."[23]

Also, the evidence must establish a " 'causal relationship between the particular conditions in the home and the likelihood' of serious harm to the child."[24] Merely establishing substance abuse or "nonconforming social behavior" by the parent, absent a causal relationship between that behavior and harm to the child, will not prove beyond a reasonable doubt the likelihood of harm required for termination.[25]

The superior court applied the heightened standard under ICWA to all three children, concluding that "the evidence presented at trial supports a finding beyond a reasonable doubt that continued custody by any of the parents would likely

---

[21] 25 U.S.C. § 1912(f); CINA Rule 18(c)(4).

[22] 25 C.F.R. § 23.122(a) (2025). There is a narrow exception to this requirement when cultural knowledge is "plainly irrelevant." *State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs. v. Cissy A.*, 513 P.3d 999, 1012 (Alaska 2022).

[23] *Pravat P.*, 249 P.3d at 274 (quoting *Ben M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 204 P.3d 1013, 1020 (Alaska 2009)).

[24] *Walker E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 480 P.3d 598, 610 (Alaska 2021) (quoting *Eva H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 436 P.3d 1050, 1054 (Alaska 2019), *abrogated by State v. Cissy A.*, 513 P.3d 999).

[25] 25 C.F.R. § 23.121(d).

result in serious emotional or physical damage to [Simone] and [Sylvie], as well as [Anais]."[26]

The superior court heard testimony from two expert witnesses at the termination trial, both of whom recommended termination.[27] The experts detailed the harm that the children have already experienced due to Violet's substance abuse, and the risk of further harm if the children were to be returned to Violet's care, at least until she could demonstrate a year of sustained sobriety.

Violet argued that the expert testimony was insufficient because the cultural expert "was not even asked about serious harm," "knew nothing about the relationship between Violet and her children," and was therefore ill-equipped to assess the likelihood of harm in light of the Tribe's prevailing social and cultural standards.

A cultural expert "should be qualified to testify as to the prevailing social and cultural standards of the Indian child's Tribe."[28] But such an expert need not "specifically state h[is] conclusions regarding risk to the child in the same language used in ICWA § 1912(f)," as long as the testimony supports the court's finding.[29] While

---

[26] The finding of serious harm is required only in regard to Anais, who is an Indian child; it was not required for Simone and Sylvie, who are not enrolled or eligible for membership in a tribe. The statute regarding termination of parental rights over non-Indian children contains no functional equivalent of ICWA's requirement for a finding of "serious emotional or physical damage." *Compare* AS 47.10.088, *with* 25 U.S.C. § 1912(f).

[27] In its written decision, the superior court also referenced the testimony of two additional experts who testified at the adjudication trial, but not at the termination trial. On appeal, Violet argues that it was improper for the superior court to rely on "stale" testimony from the adjudication trial. However, the superior court addressed this concern when it noted that "the facts on which [the experts] based [their] opinion[s], including the children's prior trauma and [Simone's] and [Anais's] enhanced special needs, remain unchanged."

[28] 25 C.F.R. § 23.122(a).

[29] *Marcia V. v. State, Off. of Child.'s Servs.*, 201 P.3d 496, 508 (Alaska 2009).

the cultural expert here did not expressly opine that the children were likely to suffer "serious emotional or physical damage" if returned to Violet's care, his testimony clearly supported that finding when he recommended that the children should not be returned to Violet's care until she could demonstrate a full year of sobriety. Further, the second expert testified as to the specific harm the children experienced as a result of Violet's substance abuse. Therefore, it was not necessary for the cultural expert to also testify on this point because the aggregated expert testimony supported a finding of harm and established a causal relationship between the harm and Violet's substance abuse.[30]

Furthermore, the maternal grandmother's lay testimony supported a finding of harm by providing context for the specific harm Simone and Anais suffered when they were last in Violet's custody.[31] Anais, who was four years old when she was brought to her grandmother's home in 2020, "had missed the majority of her days at school," "was almost non-verbal," "not even close to being potty-trained," and was "almost afraid of her own shadow." Simone, who had been completely potty-trained when she returned to Violet's care in 2019, was back in diapers and pull-ups by the time she returned to her grandmother's care. Simone had also missed over 41 days of school, and her language skills had decreased. Immediately prior to being placed in her grandmother's care, Sylvie tested positive for exposure to methamphetamine, heroin, and marijuana. She had a "horrible" diaper rash, and both of her ears were infected.

---

[30]    *O'Brien v. Delaplain*, 556 P.3d 1170, 1185 (Alaska 2024) (explaining that if another expert testifies as to causal relationship between parental conduct and likelihood of harm, cultural expert need not testify on this point).

[31]    *See Bob S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 400 P.3d 99, 108 (Alaska 2017) (providing that elements of serious harm to child "may be proved through the testimony of one of more expert witnesses, or by aggregating the testimony of lay and expert witnesses").

Moreover, all three children are likely to experience further harm if returned to Violet's care because the condition that caused the harm, Violet's substance abuse, had not been resolved at the time of the termination trial. As noted by the superior court, "predictions at the adjudication trial that [Violet] was likely to experience future substance abuse problems if drugs were readily available to her or she spent time with other people who were using" had proven accurate. Violet never made more than sporadic progress in treatment, and in the few months following her discharge in 2023, she tested positive for methamphetamine twice, moved back in with Roman (whose substance abuse remained untreated), and ceased all communication with OCS. While Violet maintained that she was sober at the time of trial, she had not been able to demonstrate sobriety for any sustained period outside of the treatment setting.

"[A] parent's documented history of conduct [can be] a predictor of future behavior,"[32] and Violet has a history of substance abuse spanning over two decades. Therefore, the evidence supports the superior court's finding "that [Violet's] struggles with substance abuse continue at present and are likely to continue in the future." The superior court did not clearly err in finding there was proof beyond a reasonable doubt that the children are likely to experience serious harm if returned to Violet's care.

## C. The Superior Court Did Not Clearly Err By Finding That Termination Is In The Children's Best Interests.

Violet argues the superior court erred by finding that termination is in the children's best interests. She points to the superior court's findings regarding the "very strong" bond that she has with her children, that even when Violet had otherwise stopped engaging with OCS, she remained "very consistent" with visitation, taking

---

[32] *Trevor M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 368 P.3d 607, 612 (Alaska 2016) (quoting *Sherry R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 332 P.3d 1268, 1274 (Alaska 2014)).

"every opportunity to spend time with the girls." Violet also points to the court's findings that she was always "fully engaged and attentive" and "able to meet the children's needs during the visits." The superior court commended Violet for the strength of her bond with the children, adding that "it is clear that the children love [Violet] very much, and she loves them," and that it is "in the children's best interests for [Violet] to remain in their lives." But the strength of the relationship between a parent and her children is but one of many factors a court may consider when engaging in a best interest analysis.[33]

Before terminating parental rights, a court must find by a preponderance of the evidence that termination is in the best interests of the child.[34] We review such a finding for clear error.[35] While any fact relevant to the child's best interests may be considered,[36] AS 47.10.088(b) provides five factors to guide the court's consideration: (1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs, (2) the amount of effort by the parent to remedy the conduct or the conditions in the home, (3) the harm caused to the child, (4) the likelihood that the harmful conduct will continue, and (5) the history of conduct by or conditions created by the parent. The superior court did not clearly err when it considered these factors and found that termination of Violet's parental rights was in the best interests of her children.

---

[33] *See* AS 47.10.088(b) ("the court may consider any fact relating to the best interests of the child"); *Karrie B. ex rel. Reep v. Catherine J.*, 181 P.3d 177, 186 (Alaska 2008) (holding that superior court did not err when considering mother-child bond as part of its analysis of "best interests" of children).

[34] AS 47.10.088(c); CINA Rule 18(c)(3).

[35] *Hannah B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 289 P.3d 924, 932 (Alaska 2012).

[36] *Id.*

As to the first factor, the superior court found that the children could not be returned to Violet's care within a reasonable time. This finding is supported by evidence that Violet failed to demonstrate sobriety at the time of the trial and that she would need at least a year of sobriety before the children could be safely returned to her care. As noted above, both experts who testified at the termination trial recommended that the children should not be returned to Violet until she had demonstrated a full year of sobriety. We agree with the superior court that it is not reasonable to wait another year for the children to be returned to Violet because they have been in OCS custody for approximately four years, and they need permanency, especially given Simone's and Anais's special needs and Sylvie's young age.[37] And while Violet said that she was willing to engage with OCS and do whatever was necessary to regain custody of the children, the superior court accurately perceived that Violet made similar promises at the adjudication trial, "and then proceeded to spend another year entrenched in heavy methamphetamine use, regardless of the consequences to [herself] and the children."

As to the second factor, the superior court acknowledged the efforts Violet made to remedy her conduct, but found that "[s]he did not begin any treatment until after the children had been out of the home for more than two years." Third, the court detailed the harm that the children have already endured in Violet's care through environmental exposure to controlled substances, developmental regression, and a general lack of attention to daily needs. The evidence demonstrates that Violet's efforts to remedy her conduct have been delayed and inconsistent, and that the children have clearly suffered harm in her care. The court did not clearly err by finding that these factors weigh in favor of termination.

---

[37] We determine what constitutes a "reasonable time" on a case-by-case basis, "[b]ut we emphasize that the statute clearly puts the criteria for 'reasonable time' in terms of the child[ren]'s needs." *Christina J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 254 P.3d 1095, 1108 (Alaska 2011).

Finally, considering the fourth and fifth factors, the superior court found that Violet's decades-long history of substance abuse indicates that her harmful conduct is likely to continue. Following successful completion of inpatient treatment in 2023, she relapsed almost immediately upon discharge. And after the relapse, Violet "shut down" and refused to work with OCS. Thus, the court did not clearly err by finding that these factors also support termination of parental rights.

In sum, the superior court did not clearly err in finding that the statutory factors favored termination of Violet's parental rights as being in the children's best interests. Although Violet maintained a loving relationship with her daughters through consistent visitation, we are not left with "a definite and firm conviction"[38] that this circumstance standing alone is sufficient to outweigh the other factors, all of which strongly favored termination.

## V.    CONCLUSION

We AFFIRM the superior court order terminating parental rights.

---

[38]    *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004).