NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| NICHOLAS H., | ) | |
| | ) | Supreme Court No. S-16264 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-13-00134 CN |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| STATE OF ALASKA, | ) | AND JUDGMENT* |
| DEPARTMENT OF HEALTH & | ) | |
| SOCIAL SERVICES, OFFICE OF | ) | No. 1612 – February 6, 2017 |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Eric A. Aarseth, Judge.

Appearances: Randall S. Cavanaugh, Kalamarides & Lambert, Anchorage, for Appellant. Seth M. Beausang, Assistant Attorney General, and James E. Cantor, Acting Attorney General, Anchorage, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

## I.  INTRODUCTION

Olga was born in October 2012 to Nicholas Hanson and Nancy Homes.[1] She is affiliated with the Native Village of Barrow through her mother. Because of

---

\*        Entered under Alaska Appellate Rule 214.

1        We use pseudonyms to protect the privacy of the parties.

concerns about Homes's drug use during her pregnancy with Olga and a domestic violence episode in the couple's home shortly after Olga's birth, the Office of Children's Services (OCS) took emergency custody of Olga in April 2013. OCS developed a case plan for Hanson to address his extensive history of domestic violence, treat his marijuana and alcohol abuse, help him develop healthy parenting skills, and assist him in developing a relationship with his daughter. Hanson failed to make progress on most of these requirements for several years. The superior court terminated Hanson's parental rights, basing its decision largely on Hanson's history of domestic violence, current substance abuse, and failure to address either through his case plan. Hanson argues that the court erred in evaluating witnesses and weighing testimony when making the findings required to terminate his parental rights. Because all of the court's findings have clear support in the record and are sufficient to allow for adequate appellate review, we affirm the superior court's decision to terminate Hanson's parental rights.

## II.    FACTS AND PROCEEDINGS

### A.    OCS Takes Emergency Custody Of Olga And Develops A Case Plan.

Olga was born in October 2012 to Hanson and Homes. Olga is believed to be an Indian child as defined in the Indian Child Welfare Act (ICWA) through her mother, whose tribal affiliation is with the Native Village of Barrow.[2] Homes and Hanson lived together when Olga was born, along with Homes's three other children by a different father. At the time of Olga's birth, hospital staff allegedly reported that Homes had admitted to using oxycodone and hydrocodone during her pregnancy, as well

---

[2]    25 U.S.C. § 1903(4) (2012) defines Indian child as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."

as to daily use of marijuana as recently as the day before Olga's birth. When OCS approached Homes, she denied the allegations and refused to take a drug test.

After receiving additional reports regarding drug use and domestic violence in Homes and Hanson's home, OCS took emergency custody of Olga in April 2013. Olga was placed in a foster home and Olga's half-siblings went to live with their biological father temporarily. In July 2013 both Hanson and Homes stipulated that Olga was a child in need of aid. Homes continued to abuse substances, failed to maintain consistent contact with OCS and Hanson, and is not part of this appeal.

Four months after OCS took custody of Olga, it placed her with her current foster parents, who also recently adopted Olga's three half-siblings on Homes's side and wish to adopt Olga. Olga is in a special needs program because of delayed speaking, but she has shown great improvement in her speech with the help of therapy at her preschool.

Two weeks after OCS took custody of Olga it assigned caseworker Katrielle Rios to Hanson's case. She called to discuss Hanson's case plan, but Hanson said he wanted his attorney present. Rios arranged a meeting with Hanson's attorney, but Hanson cancelled the meeting; Rios and Hanson eventually spoke over the phone. Rios testified that Hanson spoke to her in a derogatory manner. He also told her that he did not have time to visit his daughter.

Hanson's case plan included meeting with his caseworker at least once a month, visiting with Olga, completing a domestic violence and anger management intervention program, undergoing urinalysis tests (UAs), completing a substance abuse assessment, and participating in the Father's Journey parenting program. Father's Journey offers parenting classes, but does not offer batterer's intervention programs, psychological services, or treatment for substance abuse. To facilitate this case plan, Rios referred Hanson for a substance abuse assessment with Jett Morgan Treatment Services. She also referred him to the Men's and Women's Center, which offers a

domestic violence and anger management intervention program. Hanson participated in the substance abuse assessment with Jett Morgan and was scheduled to begin outpatient treatment to address his marijuana abuse in July 2013 when he was arrested for assaulting Homes.

Hanson was convicted of the assault in December 2013 and was confined in Parkview Center until May 2014. This was not his first conviction. From 1996 to 2013 Hanson was convicted eight separate times for violence against a person. One of these convictions was for assaulting his girlfriend's toddler while babysitting. Hanson also has a 2007 felony conviction for possession of a controlled substance with intent to distribute. While at Parkview Hanson was convicted on four counts of contacting Homes in violation of a protective order issued after his July 2013 domestic violence conviction for assaulting her.

During Hanson's Parkview Center confinement, OCS assigned Sharol Patraw to Hanson's case. While Parkview initially prevented Hanson from taking classes or seeking treatment in the community because he was unsentenced, Patraw reported that by February 2014 Hanson was taking Moral Reconation Therapy classes and "starting to be able to get out into the community to do treatment." Shortly after Hanson left Parkview Center in May 2014, Patraw told Hanson that he was to participate in UAs and discussed setting up visitations with Olga. She also updated his case plan: the plan added attending Alcoholics and Narcotics Anonymous meetings, completing a substance abuse assessment, and following the assessment's recommendations. In September 2014 Hanson told Patraw he was participating in UAs through his probation officer even though he had previously stated he was not on probation. When Patraw called to talk with the probation officer Hanson had identified she was told no officer by that name existed. At that point Hanson was living in a shelter.

In November 2014 OCS caseworker Jaime Browning temporarily took over

Hanson's case. It had been a little over a year and a half since OCS had taken custody of Olga. According to Browning, Hanson had made significant progress on only one of the recommendations in his case plan, namely developing a relationship with his daughter through visitation set up by OCS. The Cook Inlet Tribal Council (CITC), which was supervising visitation, reported progress by "leaps and bounds" in this area. Hanson had also attended five out of 14 classes in Healthy Relationships and five out of 13 classes in Parenting Support with CITC's Father's Journey program.

However, Hanson was not regularly participating in UAs, which OCS paid for, during the majority of his case, because it was "too time consuming." Hanson also tested positive several times for marijuana but continued to deny having a substance abuse problem. In addition, he had failed to complete the anger management and domestic violence intervention program recommended in his case plan and was living with a woman whose recently opened OCS case included reports of domestic violence and substance abuse.

**B.      OCS Files A Petition To Terminate Hanson's Parental Rights And The Superior Court Conducts A Trial**.

In December 2014 OCS sent a letter to both Hanson and Homes informing them that it intended to file a petition to terminate their parental rights at an upcoming permanency hearing in January 2015 and they "needed to be motivated since those were kind of their final hours." OCS filed the petition to terminate in January 2015, alleging Olga was a child in need of aid under AS 47.10.011(1) (abandonment), (2) (incarceration), (8) (mental injury), (9) (neglect), (10) (substance abuse), and (11) (mental illness).

After OCS filed the petition, Hanson made some efforts to follow his case plan, but continued to lie to service providers and failed to follow through with recommendations. In March 2015 he successfully completed the two courses he had

started with CITC. Hanson also underwent a substance abuse assessment with Jett Morgan, which recommended intensive outpatient treatment for severe alcohol and cannabis use disorders, but he did not follow this treatment recommendation. Two months later Hanson twice tested positive for benzodiazepine. In May 2015 Hanson also underwent a substance abuse assessment with Southcentral Foundation and completed the 12-hour Alcohol and Drug Information School it recommended. However, in that assessment he said that he had never used marijuana, contradicting several positive UAs.

By February 2015 visitation had been moved to Wasilla because Olga's foster parents were unable to transport Olga to Anchorage. Hanson said this was inconvenient and that he did not have transportation, so OCS provided bus transportation. To increase visitation opportunities, CITC caseworker Tony Seeganna made several offers starting in January 2015 to drive Hanson to Wasilla and facilitate visitations, but OCS did not take him up on the offer until July 2015. However, visitation nevertheless took place between January and July 2015.

In June 2015 OCS caseworker Cynthia Ontiveros took over Hanson's case. She contacted Hanson and scheduled a meeting for the beginning of July, but he did not show up. When they eventually met at some point in July, Hanson informed Ontiveros that he had his own housing and was driving himself to Wasilla for visitation with his daughter. Alaska Family Services reported, however, that at one point he was under the influence of something while visiting with Olga.

In September 2015 Hanson completed a domestic violence assessment with Judy Gette, who later testified as an expert at assessing the risk of a perpetrator committing further domestic violence crimes. Based on two separate tests, Gette determined that Hanson was at high risk of committing domestic violence in the future. One test placed him in the highest risk category. Gette noted that Hanson gave strange and unresponsive answers to some of her questions, so she recommended a

psychological evaluation. She also recommended that he complete a batterer's intervention program, depending on the results of his psychological evaluation, and she described him as not acknowledging his problematic behavior.

In accordance with Gette's recommendation, Hanson underwent a psychological evaluation over the course of two separate days in September and October 2015 with Dr. Bruce Smith. Dr. Smith later testified as an expert at Hanson's parental rights termination trial. Dr. Smith administered three different tests to evaluate Hanson. The first "suggested some long-term personality characteristics associated with feeling alienated from others and perhaps . . . experiencing unusual symptoms such as delusional beliefs and circumstantial or tangential thinking." The test also indicated that because Hanson had answered the test's questions defensively, its results with regard to Hanson's psychological problems were probably suppressed.

The second test was rendered invalid because the validity scales suggested that Hanson was careless or unwilling to complete the test in an authentic manner. Dr. Smith acknowledged that potentially having his parental rights terminated could be a reason for Hanson's defensiveness, but he also had concerns about Hanson's cognitive abilities and possible schizotypal personality disorder or a form of schizophrenia, although he could not form a clear diagnostic impression over the course of two days. He acknowledged that a lack of understanding or other cognitive issues could have led to the recurring invalidity of the administered tests.

The third test was based on Hanson's self-reported history of drug use. Dr. Smith concluded that Hanson had a mild marijuana-use disorder, but noted that its mildness "may be an under-report." In his report, Dr. Smith described Hanson as reflecting "a proneness to deny problems" and attempting to "present a problem free picture to the examiner," but also indicated that he "appeared genuine in his statements about changing his lifestyle and wanting to be a provider and hands on parent with his

child." Dr. Smith recommended that Hanson abstain from drugs and alcohol, obtain a psychiatric assessment to address concerns over his disorganized speech, and complete a 36-week batterer's intervention program.

OCS caseworker Leslie Johnston took over Hanson's case in October 2015. She and Hanson communicated primarily through email. Hanson would often give random responses, replying "hell is empty and all the devils are here" at one point. When she had her first meeting with Hanson in November 2015, he informed her that the UAs had expired, so she had them renewed.

In January 2016 Hanson told Johnston that he had met with Resolution Services for an assessment for domestic violence and anger management in accordance with the recommendations made by Dr. Smith and expressed his willingness to do a psychiatric assessment. Johnston had him fill out release of information forms and called organizations that could potentially perform the psychiatric assessment. As of January 2016, however, Hanson had yet to complete a psychiatric assessment or complete a batterer's intervention program.

Superior Court Judge Eric A. Aarseth held a three-day trial on OCS's petition for termination of Hanson's and Homes's parental rights in January 2016. In addition to Gette and Dr. Smith, OCS caseworker Philip Kaufman testified as an expert. Kaufman testified that Hanson's drug use and significant criminal and domestic violence history were inconsistent with raising a child. Kaufman stated that children need stability and that although Hanson loved his child and was caring and affectionate towards her, his chaotic lifestyle threatened Olga's safety. Kaufman considered this to be especially true given that Olga's special needs required attention throughout the day and adherence to prescribed therapies. Kaufman also testified that Hanson's inability to control his behavior was concerning because toddlers can be challenging. Kaufman noted that at the time of trial Olga had been in OCS custody and out of home placement for

approximately 29 months, a kind of "legal limbo" that he said is bad for a child, especially one as young and vulnerable as Olga. Kaufman also thought that it was good for Olga to live with her half-siblings. For these reasons, Kaufman concluded that it was in Olga's best interest that Hanson's parental rights be terminated, freeing Olga to be adopted by her foster parents.

Four witnesses testified in support of Hanson. Tony Seeganna, a CITC case manager, worked with Hanson between January and October 2015. He testified that between January and June 2015, OCS failed to respond to his offers to facilitate visits between Hanson and Olga. After OCS eventually responded affirmatively, Seeganna drove Hanson to Wasilla from Anchorage several times, giving him the opportunity both to observe visitations and to attend several meeting between Hanson and OCS. Seeganna testified that Hanson "seemed to be a very good father when his daughter was with him," that she was happy to see him during visits, and that he never raised his voice. Seeganna also testified that sometime around October 2015, OCS abruptly ended the visits, even though he had observed nothing to warrant such a decision. Seeganna is a Native Alaskan and had worked with many Native Alaskan families and ICWA workers in many different villages. He considered visitation to be very important in such contexts.

Jessica Burdick, a CITC family contact case manager, offered testimony similar to that of Seeganna. She supervised visitation between Hanson and Olga. She considered the relationship between Hanson and his daughter normal and thought that a bond existed between the two. She saw nothing to concern her during visitations and reported that the supervision level was decreased to intermittent during her time as CITC case manager, meaning that Hanson and his daughter did not need to be in sight of someone else.

Theodis Burse also offered testimony in support of Hanson. Burse had worked with Hanson at several jobs. Burse had seen Hanson interact with his daughter

as well as with Burse's own children. He considered Hanson a good father that spoiled his children. Burse acknowledged he was not aware that Hanson used drugs and was surprised at the number of criminal convictions he had.

Finally, Ben Hannah testified. Hannah had known Hanson for twenty years. He testified that he had been to Hanson's house several times when the children were there and had no concerns about his parenting. He reported that Hanson kept a clean and organized house with food, that he never saw any arguments between Hanson and Homes, and that he would trust his own son with Hanson.

Hanson himself also testified. He had not seen his daughter in three months but insisted that he had never stopped trying to get her back. He testified he had a domestic violence and anger management class scheduled for that very day. He also stated that he honestly believed that he could parent his child safely and that he had left domestic violence in his past.

## C. Superior Court Grants The Petition To Terminate Hanson's Parental Rights.

The superior court granted the petition to terminate the parental rights of both Homes and Hanson.

### 1. The superior court found that Olga had been abandoned and was at substantial risk of injury due to Hanson's behavior and substance abuse.

The court found by clear and convincing evidence that Olga was subjected to conditions or conduct described in AS 47.10.011 under subsections (1) (abandonment), (8) (mental injury), and (10) (substance abuse). With regard to abandonment, the court found Hanson abandoned Olga based on his failure "to participate in a suitable plan or program designed to reunite the parent or guardian with

the child.["3"]  The court acknowledged that Hanson had been offered and had completed parenting classes, but found that Hanson had not internalized any of the information. The court reasoned that since 2010 Hanson had been aware of and offered services to address his substance abuse as well as his anger and violent tendencies, but Hanson had merely paid lip service to the several healthcare providers involved in his case.

The court further found by clear and convincing evidence that Hanson presented a substantial risk of mental injury to Olga based on his history of domestic violence combined with his demeanor, attitude, and outlook.  This behavior and history constituted both a "pattern of rejecting, terrorizing, ignoring, isolating, or corrupting behavior that would, if continued, result in mental injury" and exposure to domestic violence crimes under AS 47.10.011(8)(B).  The court summarized Hanson's criminal record, highlighting that some convictions arose out of the same event, distinguishing between violent and non-violent crimes, emphasizing more recent offenses, and making note of Hanson's felony assault on a child.

The court also found by clear and convincing evidence that Olga was a child in need of aid due to Hanson's substance abuse.  The court found it significant that Hanson reported during a substance abuse assessment in February 2015 that he had never used marijuana, even though his UAs repeatedly tested positive for marijuana.  The court found that from 2013 through 2016, Hanson had 29 positive UAs, 18 negative UAs, 42 no-shows, and 32 that he showed up for but which OCS had failed to fund; yet Hanson had repeatedly denied using or having a problem with drugs.  The court emphasized that for Hanson the whole process was a "con game," citing his "repeated failures and discharge due to refusals to even show up and participate."  For these reasons, the court found that Hanson's drug use created a substantial risk of harm to Olga

---

[3]     AS 47.10.013(a)(4).

under AS 47.10.011(10).

**2. The superior court found Hanson had failed to remedy the conditions that placed Olga at risk.**

The court next found by clear and convincing evidence that Hanson had not remedied his "conduct such that it would be safe to return [Olga] to [his] care." The court cited the minimal progress Hanson had made in his case plan, his failure to cooperate with healthcare providers, and his failure to follow through with treatment, as well as his tendency to evade, minimize, and deny his issues.

**3. The superior court found OCS made active efforts to prevent the breakup of the family.**

The court found by clear and convincing evidence that OCS made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the family and that those efforts had proven unsuccessful. The court based its decision on OCS's efforts to provide services, directly as well as through the Department of Corrections. While the court acknowledged "some gaps here and there," it considered that on the whole "the wraparound services provided" were reasonable. The court stated that Hanson would complain about OCS failing to refer him to certain providers, but he would then render the providers' assessments useless by not cooperating or engaging with them.

**4. The superior court found that returning Olga to Hanson would likely result in serious emotional or physical damage to her.**

The court found beyond a reasonable doubt that the return of Olga to Hanson's custody would likely result in serious emotional or physical damage to the child. The court found that if Olga were returned to Hanson's custody "there would be serious emotional damage to her and in particular with respect to [Hanson's] violent tendencies that there would likely be physical damage to her." The court relied on both the evidence about the parents' conduct as well as the expert testimony of Gette,

Kaufman, and Dr. Smith, which the court found reliable and credible. The court specifically discussed Gette's opinion that Hanson is in the highest category of risk for reoffending.

> **5.** **The superior court found that it is in Olga's best interests to terminate Hanson's parental rights.**

The court found by a preponderance of the evidence that the termination of Hanson's parental rights is in Olga's best interests. It reasoned that the "vast majority of the evidence absolutely supports the granting of this petition so that [Olga] is freed for adoption." The court explained that terminating Hanson's parental rights was necessary to give Olga a "new forever home" and a chance of having a very successful life, which the court considered her unlikely to have with Hanson.

> **6.** **The superior court found that OCS's witnesses were credible whereas those testifying in support of Hanson had a limited view of the case.**

Lastly, the court discussed its assessment of the credibility of the witnesses that testified at trial. The court found OCS's witnesses credible, reliable, and free of bias. The court also found that Seeganna was reliable, but that he had a limited view of the case. The court acknowledged that Burse testified that Hanson was "trying his best," but it found that Burse's testimony addressed only a limited aspect of the case. The court did not mention the testimony of Burdick or Hannah, who testified in support of Hanson.

## III.   STANDARD OF REVIEW

In a child in need of aid (CINA) case, we review the superior court's factual findings supporting termination of parental rights for clear error.[4] Clear error is found only if a "review of the entire record leaves us 'with a definite and firm conviction that

---

[4] *David S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 270 P.3d 767, 774 (Alaska 2012).

the superior court has made a mistake.' "[5]   "Generally, conflicting evidence is insufficient to overturn the superior court's decision, and we will not reweigh evidence when the record provides clear support for the superior court's ruling."[6]   We give deference to the superior court's credibility determinations, especially for oral testimony.[7]  But "[w]hether there are sufficient findings for informed appellate review is a question of law."[8]

"Whether the trial court's findings satisfy the requirements of the child in need of aid statutes and rules is a question of law which we review de novo."[9]  "We review ICWA's 'active efforts' requirement as a mixed question of law and fact."[10]

## IV.   DISCUSSION

To terminate parental rights of an Indian child under ICWA and the CINA rules and statutes, the superior court must find by clear and convincing evidence that the child has been subjected to conduct described in AS 47.10.011;[11] that the parent has not

---

[5]      *Id.* (quoting *S.H. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 42 P.3d 1119, 1122 (Alaska 2002)).

[6]      *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 949 (Alaska 2013) (quoting *Hannah B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 289 P.3d 924, 930 (Alaska 2012)).

[7]      *Id*. (citing *Hannah B.*, 289 P.3d at 930).

[8]      *Horne v. Touhakis*, 356 P.3d 280, 282 (Alaska 2015) (quoting *Hooper v. Hooper*, 188 P.3d 681, 685 (Alaska 2008)).

[9]      *David S.*, 270 P.3d at 774.

[10]      *Id.*

[11]      AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A).  In this case, the superior court found that Olga had been subjected to abandonment, a substantial risk of mental
(continued...)

remedied, or has failed to remedy within a reasonable time, the conduct or conditions in the home that place the child at substantial risk of physical or mental injury;[12] and that active but unsuccessful efforts have been made to provide remedial services and rehabilitative programs to prevent the breakup of the Indian family.[13] The court also must find "by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[14] The court also must find by a preponderance of the evidence that terminating parental rights is in the best interests of the child.[15] ICWA requirements apply even when OCS seeks to terminate a non-Indian parent's rights to an Indian child.[16]

The superior court made all the findings required in a parental rights termination decision. Hanson's statement of points on appeal suggests that he intended to challenge some of these statutorily required findings.[17] However, Hanson's briefs refer to none of these findings specifically. Instead, Hanson appears to contest several

---

[11](...continued) injury due to Hanson's violent behavior, and a substantial risk of harm due to Hanson's substance abuse.

[12] AS 47.10.088(a)(2); CINA Rule 18(c)(1)(A).

[13] 25 U.S.C. § 1912(d) (2012); CINA Rule 18(c)(2)(B).

[14] 25 U.S.C. § 1912(f); *see also* CINA Rule 18(c)(4).

[15] CINA Rule 18(c)(3); *see also* AS 47.10.088(c).

[16] *Wilson W. v. State, Office of Children's Servs.*, 185 P.3d 94, 101 n.14 (Alaska 2008); *K.N. v. State*, 856 P.2d 468, 474 n.8 (Alaska 1993).

[17] Hanson's statement of points on appeal lists the following findings: (1) the child in need of aid finding; (2) the failure to remedy finding; (3) the active efforts finding; and (4) the best interest finding.

factual findings underlying these determinations. His arguments can be understood as asserting that the court erred by (1) finding that Hanson was not meaningfully engaging in his case plan; (2) declining to credit the testimony of Hanson's witnesses over the testimony of OCS's witnesses; (3) making insufficient findings for informed appellate review by not mentioning some of Hanson's witnesses; (4) finding that OCS made active but unsuccessful efforts to provide remedial services and rehabilitative programs to prevent the break up of the Indian family; and (5) giving more weight to expert witness testimony than testimony from Hanson's witnesses regarding the likelihood of future harm to Olga.[18] After reviewing the record, we conclude that the superior court did not err with respect to any of these findings.

A.    **The Superior Court Did Not Clearly Err By Finding That Hanson Was Not Meaningfully Engaging In His Case Plan.**

Hanson argues that the superior court's determination that he "merely gave lip-service to the providers and [was going] through the motions" is not supported by the record and is clearly erroneous. To the contrary, Hanson argues, he "stabilized his life and proved he had changed by not committing new offenses" and "engaged in services

---

[18]    Hanson also argues in his reply brief that a recent court of appeals' decision affirming Hanson's convictions on four counts of violating a no contact order, but raising doubts about their constitutionality, undermines the superior court's factual findings because the superior court relied on those convictions in its decision. However, the superior court distinguished between violent and non-violent crimes in making its determination that Hanson posed a threat of mental or physical injury to Olga, signaling clearly that it was principally relying on Hanson's past violent crimes rather than on no-contact violations. Moreover, the convictions were ultimately affirmed on appeal, despite any doubts regarding issues that were not raised and briefed in that appeal. Finally, Hanson first raised this argument in his reply brief, even though the court of appeals' decision was published 11 days before Hanson filed his initial brief. Raising an argument for the first time in a reply brief is generally impermissible. *See Crane v. Crane*, 986 P.2d 881, 887 n.14 (Alaska 1999).

and completed programs." Hanson briefly contrasts these behaviors with three cases in which parents who threatened social workers had their parental rights terminated.[19]

The superior court did not clearly err in finding that Hanson was only paying lip-service to his case plan. First, a finding that a parent is failing to remedy his conduct may be based on behaviors other than threatening an OCS caseworker. For example, in *Sherman B. v. State* we affirmed the superior court's finding that a father failed to remedy the conditions that placed the child in need of aid, in part based on the "difficulty that social service providers had in trying to work with him" and because he "failed to comply with other aspects of his case plan, namely informing OCS about his housing and employment situation."[20] These are behaviors similar to those of Hanson, who lied to and failed to cooperate with service providers yet did make some progress on aspects of his case plan. Hanson's comparison of his case to cases in which parents threatened social workers does not undermine the court's factual finding that he was not meaningfully engaging in his case plan.

Second, the evidence Hanson points to is not enough to leave us "with a definite and firm conviction that the superior court has made a mistake" in its evaluation

---

[19] *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1265 (Alaska 2008) (affirming termination of parental rights of mother who threatened OCS workers as they took her children); *Wilson W.*, 185 P.3d at 97 (affirming termination of parental rights of father that threatened to kill social workers); *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 55 (Alaska 2003) (affirming termination of parental rights of father who threatened social worker with bodily harm while imprisoned).

[20] *Sherman B. v. State, Dep't of Health & Soc. Servs.*, 310 P.3d 943, 952 (Alaska 2013).

of Hanson's efforts.[21] As the superior court acknowledged, Hanson completed parenting classes with CITC and was seen by several providers that conducted assessments. However, the record gives clear support for the court's ultimate determination that Hanson was "simply not amenable to treatment and the services that [were] offered to him." In December 2014, 20 months after OCS took custody of Olga, Hanson had made significant progress on only one out of the three goals in his case plan. This lack of progress may be explained in part by Hanson's incarceration from July 2013 to May 2014, but Hanson was able to get out into the community for treatment by at least February 2014. While Hanson completed the Alcohol and Drug Information School in May 2015 after an assessment with Southcentral Foundation, he lied during that assessment that he had never used marijuana. When Jett Morgan recommended intensive outpatient treatment in March 2015, Hanson did not follow the treatment recommendation, and still had not done so as of January 2016, the month trial began. And although Hanson attended assessments with expert witnesses Gette and Dr. Smith, Gette described him as not acknowledging his problematic behavior, and Dr. Smith said he had a "proneness to deny problems" and "present a problem free picture to the examiner." Finally, Hanson had two and a half years to participate in a batterer's intervention program, but only started attending classes the month of trial. In light of this record, we conclude that the superior court did not clearly err in finding that Hanson did not meaningfully engage in his case plan.

---

[21] *David S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 270 P.3d 767, 774 (Alaska 2012) (quoting *S.H. v. State, Dep't of Health & Social Servs., Div. of Family & Youth Servs.*, 42 P.3d 1119, 1122 (Alaska 2002)).

**B.** **The Superior Court Did Not Clearly Err By Declining To Credit The Testimony Of Hanson's Witnesses Over The Testimony Of OCS's Witnesses.**

Hanson argues that the superior court's decision on the record "completely ignores" the testimony of Hannah, Burdick, and Burse and makes no finding as to their credibility. He argues that their testimony was based on "direct observations of the father and children" and "provide[d] the relevant evidence proving that [Hanson] was able to care for his child and had changed." Therefore, Hanson argues, their testimony should be given "greater weight." His main point appears to be that they had "more direct and consistent contact with [Hanson]" than those testifying for OCS and "demonstrated that [Hanson] had made progress in [h]is efforts to be re-united with his daughter." Similarly, Hanson argues that the superior court erred in evaluating Seeganna's testimony, which he asserts contradicts the court's finding that Hanson was "[going] through the motions" and thought the whole process was a "con game."

In essence, Hanson asks us to re-weigh evidence and reassess witness credibility, but we have held that we will not do so "when the record provides clear support for the superior court's ruling."[22] Here, while the two sets of witnesses presented different pictures of Hanson's efforts and ability to parent his child, the superior court's determinations that Hanson's witnesses had a limited view of the case and that Hanson had not meaningfully engaged in his case plan are supported by the record. For example, Seeganna only worked with Hanson from January through October 2015 and primarily knew Hanson through his observations of visitation. But the court's finding was based on other factors, such as Hanson's failure to engage in substance abuse treatment and complete a batterer's intervention program as recommended. Seeganna even agreed that

---

[22] *Sherman B.*, 310 P.3d at 949 (quoting *Hannah B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 289 P.3d 924, 930 (Alaska 2012)).

Hanson had not followed through on any other part of his case plan apart from visitation.

Similarly, the superior court's view that Burse's testimony touched on only a "limited, splinter fraction of [the] case" is supported by the record. While Burse had socialized with Hanson and had seen him interact with children, his testimony did not address Hanson's failure to participate in his case plan. Additionally, Burse had not seen Hanson with Olga since she was removed from Hanson's custody two and a half years before trial, nor was he aware of Hanson's recent drug use or the number of criminal convictions Hanson had. Because the superior court's evaluation of Hanson's witnesses and OCS's witnesses is clearly supported by the record, we conclude its evaluation was not clear error.

**C. The Superior Court Did Not Fail To Make Sufficient Findings For Informed Appellate Review By Not Mentioning Some Of Hanson's Witnesses.**

Hanson argues that the superior court impeded adequate appellate review by failing to make specific findings with regard to lay witnesses testifying in support of Hanson. He argues that the testimony of Hannah, Burdick, and Burse "is not even mentioned." In support of this argument, he cites our decision in *Pietro v. Unocal Corp.*, in which we described lay testimony as " 'highly relevant,' especially when 'it tends to support or contradict the assumptions as to the facts of the claimant's history on which expert . . . witnesses rely.' "[23]

In *Pietro*, we found the Alaska Workers' Compensation Board did not make adequate findings and thereby impeded adequate appellate review when it failed

---

[23]    233 P.3d 604, 613-14 (Alaska 2010) (quoting *Smith v. Univ. of Alaska, Fairbanks*, 172 P.3d 782, 790 (Alaska 2007)).

to discuss lay witnesses in the case.[24] Those witnesses had called into question assumptions on which the expert medical witnesses relied.[25] For example, a doctor based his assumption about a worker's exposure to arsenic at work on the fact that there was no exposure to combustion products in the workplace, but a lay witness had testified that there was smoke in the work area.[26] In that context we concluded that the board's failure to evaluate the lay witness testimony impeded our ability to adequately review its decision.[27] In more analogous child custody cases, we have stated that "findings need not be extensive, but must either give us a clear indication of the factors which the superior court considered important in exercising its discretion or allow us to glean from the record what considerations were involved."[28] It is true as Hanson argues that the superior court's decision on the record does not mention the testimony of Burdick or Hannah. However, this does not impede adequate appellate review.

First, Burdick's testimony did not play a role similar to that of the lay witness testimony in *Pietro* because her testimony did not directly contradict assumptions used by OCS's experts. Burdick testified exclusively about her observations of Hanson and Olga in her role as a CITC family contact caseworker who supervised visitation, but the experts in this case addressed visitation in their testimony, or were transparent as to their limited knowledge of visitation reports when giving their opinions. OCS expert Kaufman acknowledged that Hanson exhibited affection and care

---

[24] *Id.* at 613.

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Borchgrevink v. Borchgrevink*, 941 P.2d 132, 139 (Alaska 1997) (citing *Bird v. Starkey*, 914 P.2d 1246, 1249 n.4 (Alaska 1996)).

towards Olga during visitations. Expert Gette had limited knowledge of Hanson's positive visitation but specifically addressed this lack of knowledge during her testimony, stating she was "not assessing for parenting. [She was] assessing for violence." And Dr. Smith acknowledged his lack of access to visitation reports, stating they would have been helpful in his assessment. None of these OCS witnesses based their opinions on facts directly contradicted by Burdick, and all acknowledged the information they did not possess. The court was aware of these limitations and weighed the evidence accordingly.

Second, the superior court directly addressed the principal issue raised by Burdick's testimony, positive visitation, in its oral decision several times, but found that it did not outweigh Hanson's general lack of progress on substance abuse and domestic violence. Thus, the court's failure to specifically mention Burdick's testimony does not impede our review of how the superior court struck a balance between Hanson's successful visitation and his lack of progress on other aspects of his case plan.

Similarly, the superior court's failure to mention Hannah's testimony does not prevent adequate appellate review. Hannah testified that he knew Hanson from school and socialized with him. His testimony is similar to that of Burse, another social friend of Hanson whose view of the case the court considered limited. Furthermore, the court's extended discussion of domestic violence, visitation, and substance abuse clearly indicates "the factors which the superior court considered important in exercising its discretion."[29] Finally, contrary to Hanson's claim, the court did address Burse's testimony and found his perspective "very limited." Therefore, we conclude that the superior court made sufficient findings to allow for adequate appellate review.

---

[29] *Id.*

**D.    The Superior Court Did Not Clearly Err In Finding Active But Unsuccessful Efforts Had Been Made To Prevent The Breakup Of The Indian Family.**

Hanson faults OCS's active efforts, arguing that Seeganna testified that OCS was unresponsive for six months starting in January 2015 as he called and emailed OCS offering to facilitate visitation. Hanson also points to Seeganna's testimony that OCS ended visitation abruptly and without warning a few months after Seeganna finally began assisting with visitation.

OCS responds that it repeatedly referred Hanson for services to help him accomplish his case plan, including programs for substance abuse and domestic violence; provided funding for Hanson's assessments and UAs; arranged for visitations with Olga and transportation when needed; and assigned caseworkers that repeatedly reached out to Hanson and encouraged him to make progress with his case plan. OCS also highlights Hanson's lack of effort and cooperation. It notes that Hanson initially said he was too busy to visit Olga; was arrested and convicted for assaulting Homes; continued to use drugs and test positive or not show up for UAs; failed to follow through with recommendations from substance abuse, domestic violence, and psychological assessments OCS arranged; and repeatedly lied to and failed to cooperate with OCS and his providers.

We have explained that "OCS makes active efforts to reunite a family when it helps the parents develop the resources necessary to satisfy their case plans, but its efforts are passive when it requires the parents to perform these tasks on their own."[30] The trial court may properly consider "all of OCS's efforts from the time it first became

---

[30]    *Sandy B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 216 P.3d 1180, 1188 (Alaska 2009).

involved with the family" until the termination trial.[31]  "[A] parent's demonstrated lack of willingness to participate in treatment may be considered in determining whether the state has taken active efforts."[32]

We applied these principles in *Sylvia L. v. State*, in which OCS had referred the parent to "substance abuse assessments, mental health counseling, parenting classes, and domestic violence counseling," and had also provided transportation assistance, arranged family visits, requested UA testing, and developed case plans.[33]  The mother argued that beyond initial assessments, there was neither a plan nor resources to assist her with getting treatment.[34]  While acknowledging some gaps in OCS's efforts to help the mother follow through with specific treatment options, we noted that the mother's progress was ultimately "stymied by her own evasiveness and apparent lack of interest."[35]  We affirmed the superior court's finding.[36]

As in *Sylvia L.*, here OCS took a variety of steps to help Hanson follow his case plan over a number of years despite Hanson's evasive and uncooperative behavior. While there were some minor gaps in OCS's efforts to help Hanson reunite with his daughter, OCS's extensive and long-term efforts satisfy the active efforts requirement under ICWA.

---

[31]     *Id.* at 1189.

[32]     *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 991 (Alaska 2002) (quoting *N.A. v. State, DFYS*, 19 P.3d 597, 603 (Alaska 2001)).

[33]     343 P.3d 425, 433 (Alaska 2015).

[34]     *Id.* at 431-32.

[35]     *Id.* at 433.

[36]     *Id.*

**E.** **The Superior Court Did Not Clearly Err In Giving More Weight To Expert Witness Testimony Than To Testimony From Hanson's Witnesses Regarding The Likelihood Of Future Harm To Olga.**

Hanson finally argues the superior court clearly erred in giving more weight to expert testimony regarding the likelihood Hanson would cause future harm to Olga than it gave to Hanson's testimony and the witnesses that testified to support him. ICWA requires that the trial court must find beyond a reasonable doubt "the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child" before a parent's rights may be terminated.[37] Hanson attempts to show the expert testimony was speculative by relying on our decision in *State v. Sandsness*, a tort case in which we suggested it was impossible to accurately predict future criminal activity.[38] He also cites two out-of-state cases that emphasize predicting human behavior is speculative,[39] and attacks the credibility of Kaufman's testimony by pointing out that Kaufman had not met with Hanson or his daughter. Hanson then compares this "speculative" expert testimony to the testimony offered by Hanson's witnesses, which he argues warrants greater weight.

Again, "it is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence,"[40] and we "will not reweigh

---

[37]     25 U.S.C. § 1912(f) (2012).

[38]     72 P.3d 299, 307 (Alaska 2003).

[39]     *People v. Burnick*, 535 P.2d 352, 365 (Cal. 1975); *State v. Gelichak*, 456 N.E.2d 1250, 1252 (Ohio App. 1982).

[40]     *Tessa M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 182 P.3d 1110, 1114 (Alaska 2008) (quoting *In re Adoption of A.F.M.*, 15 P.3d 258, 262 (Alaska 2001)).

evidence when the record provides clear support for the superior court's ruling."[41]  The superior court's decision to give considerable weight to expert testimony regarding future harm has clear support in the record.  Gette provided an expert opinion about the likelihood of future domestic violence, indicating that Hanson was "in the highest risk category of re-offending in the next five years."  The court was convinced that her unchallenged expert opinion provided evidence that Hanson, beyond a reasonable doubt, was likely to cause serious emotional damage to Olga in the future if she were returned to his care.  In addition, the court based its finding of a likelihood of future harm on Hanson's extensive criminal record, including his 2013 assault of Homes.  This history is consistent with and provides further support for the court's decision to give the expert testimony regarding future harm considerable weight.

Finally, Hanson's reliance on *State v. Sandsness* is misplaced.  Although predictions about future criminal activity may never be absolutely accurate, the superior court in this case did not make any finding that Hanson definitely would commit future domestic violence or other harmful conduct.  Rather, the court found that it was beyond a reasonable doubt that he was *likely* to do so.[42]  We conclude the superior court did not err in weighing testimony regarding the likelihood of future harm to Olga if she were returned to Hanson.

## V.    CONCLUSION

We AFFIRM the superior court's decision to terminate Hanson's parental rights.

---

[41]    *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 949 (Alaska 2013) (quoting *Hannah B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 289 P.3d 924, 930 (Alaska 2012)).

[42]    *See* 25 U.S.C. § 1912(f); *see also* CINA Rule 18(c)(4).