NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JACK C., | ) | |
| | ) | Supreme Court No. S-16324 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-14-00484 CN |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| STATE OF ALASKA, | ) | AND JUDGMENT* |
| DEPARTMENT OF HEALTH & | ) | |
| SOCIAL SERVICES, OFFICE OF | ) | No. 1626 – April 21, 2017 |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Gregory Miller, Judge.

Appearances: J. Adam Bartlett, Anchorage, for Appellant. Elizabeth M. Bakalar, Assistant Attorney General, and Jahna Lindemuth, Attorney General, Juneau, for Appellee. Lisa Wilson, Assistant Public Advocate, and Richard Allen, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

## I. INTRODUCTION

A father was arrested for domestic violence against his partner, resulting in Child in Need of Aid (CINA) proceedings for their son; the father remained incarcerated until just before trial commenced on the Office of Children's Services'

_____

\* Entered under Alaska Appellate Rule 214.

(OCS) petition to terminate his parental rights. The father submitted a motion to continue the trial so he would have more time to work on his case plan. The superior court denied the motion and after trial terminated the father's parental rights.[1] The father appeals the denial of the continuance and the court's finding by clear and convincing evidence that OCS made reasonable efforts to reunite him with his son. We affirm the superior court's termination decision.

## II.    FACTS AND PROCEEDINGS

Ned A. was born in November 2011 to Karina A. and Jack C.[2] Both parents had faced criminal domestic violence charges before OCS became directly involved with Ned. Jack had been convicted of fourth degree assault, a domestic violence offense, in December 2007 and again in March 2014.[3] In November 2012 Karina was arrested and charged with domestic violence assault against Jack because of an argument that turned into a physical altercation. Ned was in the home during this incident. That same day Karina filed a petition for an ex parte domestic violence protective order against Jack, which was not granted.

---

[1]    The court also terminated the mother's parental rights; she did not appeal that decision.

[2]    Pseudonyms have been used to protect the privacy of the parties.

[3]    *See* AS 11.41.230; AS 18.66.990(3)(A). The 2014 conviction was for domestic violence against Karina. The 2007 conviction appears to have been for domestic violence against a different person. Jack has also been convicted of non-domestic violence crimes both before and after Ned's birth.

## A.    Initial OCS Involvement With Ned And His Parents

OCS's first direct involvement[4] with Ned began after it received a report on August 30, 2014 of neglect and mental injury by exposure to domestic violence. The case was assigned to an initial assessments caseworker, Lisa Keith, who interviewed Karina about the allegations. Karina told Keith that she and Jack had been arguing in the bedroom when Jack began to choke her with his hands. She moved to the living room but fell, and Jack then started to strangle her with a purse strap. Ned was reportedly in the living room at the time. Karina was eventually able to leave and call the police, who interviewed her and took photos of her injuries. Jack was arrested later that evening.

During her interview with Keith, Karina explained that there had been a history of violence between herself and Jack. They had apparently been living separately for some period of time but she had allowed Jack to stay with her to try to make the family work.[5] Keith recommended that Karina file for a protective order against Jack and seek therapy for both herself and Ned. A week after her interview with Karina, Keith spoke with Karina's mother, who was concerned about Karina's possible substance abuse. OCS workers then spoke with Karina at home, but she denied using drugs and would not complete a urinalysis (UA). Keith later attempted to contact Jack at the halfway house where he was supposed to be living, but found that he had escaped. She advised Karina, who said she would call the police if she saw Jack, and OCS continued to "assess [the family] for impending danger."

---

[4]    OCS earlier received but did not substantiate an allegation of neglect based on the November 2012 incident. Another report based on domestic violence between the parents in March 2014 was screened out because Ned was not present at the time of the incident.

[5]    The record contains little information on this separation or the degree of Jack's involvement with Ned prior to these events. Karina told the police on August 28 she had allowed Jack to stay with her for the previous week.

A week after the escape another domestic violence incident occurred. The police were called to Karina's residence for a reported stabbing. Karina told them that Jack had punched her in the head, strangled her to the point she could not breathe, and threatened to kill her and himself with a knife. Then either Jack stabbed himself in the abdomen or Karina stabbed him. Jack left as the police arrived. When OCS later attempted to contact Karina, the caseworker saw Jack, reported his presence to the police, and requested a welfare check for Karina and Ned. Jack was arrested at the apartment and incarcerated at the Cook Inlet Pretrial Facility.

The caseworker did not speak with Karina on the day Jack was arrested but continued trying to make contact nearly every day after that. When the caseworker finally made contact with Karina a week later, they completed a safety plan for Ned. Because of the domestic violence and concerns about Karina's possible drug use, the plan provided for out-of-home placement of Ned with Karina's mother and stepfather; Karina's mother picked him up late that afternoon.

The caseworker made contact with Jack at Cook Inlet Pretrial the next day. They discussed Jack's background and childhood, and he "was able to articulate some level of parenting" by recognizing that Ned was very impressionable at his age and by discussing age-appropriate discipline. The caseworker testified that Jack had "denied any domestic violence, denied any drug use by himself." Jack claimed that he and Karina had "stupid arguments that get blown out of proportion" but that he did not assault her, and he said all the charges against him would be dropped for lack of evidence. According to the caseworker Jack "didn't want to talk about" his escape from the halfway house or the second domestic violence incident.

### B. OCS Emergency Custody Of Ned

OCS convened a Team Decision Making Meeting for Ned on October 20. Karina appeared in person and Jack appeared telephonically. Karina's mother,

stepfather, and father were also present. The parties discussed Jack's expected release from jail in four to six months and Karina's continuing inability to protect Ned from the substantial risk of harm he faced from exposure to domestic violence, drugs, and alcohol. OCS took emergency custody of Ned that afternoon and filed an Emergency Petition for Adjudication of Child In Need of Aid and for Temporary Custody the next day.[6]

Shortly thereafter, both Karina and Ned tested positive for drugs: Karina for amphetamine, opiates, and benzodiazepine; Ned for methamphetamine and opiates. OCS scheduled Karina for random drug testing twice a week from October 20 to November 20. She was also scheduled for four drug tests between November 24 and December 17 but she failed to show.

In late October the case was transferred to a family services caseworker, Tamara Boeckman. Boeckman met with Karina in November and discussed ways for her to work on her domestic violence and substance abuse issues. She gave Karina a schedule of domestic violence awareness groups to attend, discussed her positive UAs, and referred her for a substance abuse assessment and parenting classes. She also sent Jack a letter with her contact information, but did not respond to her prior to their in-person meeting the following May.

The superior court granted OCS temporary custody in mid-November. OCS's first case plan, issued in late November, called for monthly meetings with each parent. Activities for Karina focused on treating her substance abuse, including an assessment, UAs, and support meetings, as well as domestic violence awareness groups and a parenting skills course. Activities for Jack focused on addressing his domestic violence, including a 36-week domestic violence intervention course and a mental health

---

[6]     The petition stated that Ned was a child in need of aid under AS 47.10.011(2) (incarcerated parent), (6) (risk of substantial physical harm), (8) (exposure to domestic violence), (9) (neglect), and (10) (substance abuse).

assessment, as well as parenting skills. The case plan identified Inside Out Dads as a program he could complete while incarcerated. The primary permanency goal for Ned was reunification with one or both parents.

### C. Initial Case Conference And Subsequent OCS Efforts

At the initial case conference in early December a visitation plan was set up for Karina. Jack asked not to have Ned brought to jail for visitation; OCS agreed, but encouraged him to send pictures or letters to Ned and to notify his attorney or OCS if he wanted a visit.[7] OCS was unable to contact Karina after the meeting in November 2014. The caseworker tried to make contact each month, making phone calls where she apparently left messages and home visits where she left her business card. She did not recall a single response from Karina between the November meeting and the case being transferred to a new worker in August 2015. Karina was referred to substance abuse and parenting service providers, but she appears not to have engaged with their services, and the substance abuse provider referred her back to OCS in March 2015 because it also had been unable to reach her. Karina visited Ned consistently through December 2014 but missed 11 scheduled visits from January to March 2015 and did not contact or visit him for several weeks in April. In February Karina was convicted of shoplifting committed in November, receiving a suspended sentence, and in April she was convicted of another theft, receiving a mostly suspended sentence.

From late 2014 OCS also worked to support Ned, who was suffering from night terrors and exhibiting "self harming behaviors." The caseworker coordinated with Anchorage Community Mental Health Services in December 2014 and January 2015 to get Ned therapy services. To be accepted for services he had to qualify as "severely

---

[7] OCS's pre-disposition report in May 2015 said that Jack had written and sent a postcard.

emotionally disturbed" by showing "significant impairments in home, school, and community settings." He was diagnosed with symptoms of post traumatic stress disorder and began play therapy in May 2015.

OCS evidently did not contact Jack again until March 31, when the caseworker mailed him a letter with a copy of his case plan and two Narcotics Anonymous/Alcoholics Anonymous (NA/AA) ledgers.[8] The caseworker testified that she had mailed him a letter with her contact information when she got the case in late October 2014 but that he had not responded to her between then and May 2015. She met with him in person at Cook Inlet Pretrial in May 2015, where they discussed activities on his case plan that he could complete while incarcerated. Although he had declined visitation with Ned at the initial case conference, Jack requested visitation at this meeting. After checking with Ned's therapist the caseworker submitted a family contact referral to set up weekly visits and developed a family contact plan. Visitation started in June 2015.

In late May OCS completed a case plan evaluation and found no progress by either parent on the case plan goals. At the disposition hearing in early June, Jack appeared telephonically but Karina was absent. The superior court granted OCS custody of Ned and affirmed that his current placement was in his best interests.

OCS issued the second case plan in July, and the caseworker met with Jack that month. The case plan contained no substantive changes to the parents' goals or activities, updated the parents' progress toward their goals from "Initial" to "No

---

[8] The caseworker testified that she never received the completed ledgers back. Jack alleges that he never received a copy of the case plan until the March 31 letter, saying he was "four months behind" at that point. But he participated in the initial case conference, where the case plan was almost certainly discussed, and a copy was delivered to his attorney on December 9, 2014.

Progress," and changed the permanency goal for Ned from reunification to adoption because of Karina's "lack of engagement." In July or August the case was reassigned to a new caseworker, Mister Patton.

In June 2015 Jack was convicted of assault in the second, third, and fourth degrees and of escape for events on August 28 and September 29, 2014. He was sentenced to 18 months unsuspended time for the most serious charge. As a result he was transferred to Spring Creek Correctional Center in late August to serve the remainder of his sentence. His intake paperwork indicated a release date of March 25, 2016. During intake at Spring Creek he said he had not consumed any unauthorized substances in the preceding 30 days, and he tested negative on a routine UA. But he tested positive for methamphetamine two weeks later. At the end of September the Department of Corrections (DOC) completed an Offender Management Plan screening, in which DOC recommended Jack for substance abuse treatment, anger management, a Criminal Attitudes program, and a domestic violence intervention program. Jack signed the form and requested the recommended programs, but the record shows only that he completed an anger management program. There is no evidence that he began any of the other programs.

A permanency hearing was held in October 2015, with Jack participating telephonically and Karina absent. OCS's permanency report recommended adoption and said that a home study referral had been done for Karina's mother and stepfather, the prospective adoptive parents. The report said OCS continued to attempt, unsuccessfully, to contact Karina. It also said that Jack had completed parenting classes while at Cook

Inlet Pretrial.[9]  Finally, it said that OCS had not been given a release date for Jack.  The court agreed that the appropriate permanency plan for Ned was adoption.

### D.  OCS Petition To Terminate Parental Rights

OCS filed a termination petition in November 2015.[10]  That same month, caseworker Patton had his first conversation with Jack over the telephone.  They discussed again what Jack could do while he was incarcerated, as well as the need for Jack to send documentation of what he completed while incarcerated.  They also discussed Jack's release date and the need to get him an integrated mental health and substance abuse assessment, "which he couldn't get while he was in jail."  Jack decided not to set up visitation because he was concerned about Ned possibly being in an accident on the drive during winter.

Following this meeting Jack participated in and completed a number of programs through DOC.  By the end of January he had completed DOC's ten-week anger management course, first-aid certification, and three job-training programs.  As Patton had requested, Jack provided the documentation to OCS.  And in early December he requested a mental health assessment from DOC "to try to get [his] son back."  The staff member who replied to Jack's request said DOC was unable to provide such an assessment due to a potential conflict of interest and that he would need to have an outside party conduct it.  The record does not indicate whether Jack informed OCS of this response.

Jack was released in March 2016.  Once Jack was out of jail Patton met with him in person.  Patton referred Jack for the needed integrated mental health and

---

[9]  The record shows that Jack completed Inside Out Dads before he was transferred to Spring Creek.

[10]  OCS remained unable to contact Karina, and in January 2016 a Notice and Summons to Absent Parent was issued to her.

substance abuse assessment and enrolled him in the Father's Journey parenting class. Patton also set up weekly UAs, which Jack participated in. Finally, OCS arranged for visitation to resume, facilitated by Karina's mother and father.[11] Karina's stepfather testified that Jack had visited Ned three or four times by the time of the termination trial on April 12.

At the pre-trial conference at the end of March, Jack's lawyer indicated that Jack would probably seek a continuance of the termination trial "to give him an opportunity to work with the department now that he's [been] released." Jack moved for a continuance on the expedited schedule set by the judge. Jack argued that he had participated in the programs available to him but DOC had told him the mental health assessment requested by OCS was not available while he was in jail,[12] and that he was now working with OCS to obtain those services. Ned would not be "unduly prejudice[d]," Jack said, because his placement was "unsettled" due to a scheduled mediation regarding visitation or placement with Karina's father.

OCS and Ned's guardian ad litem (GAL) opposed the continuance. OCS argued that there was not good cause to delay permanency considering CINA proceedings' focus on the interests of the child and the Alaska Legislature's finding that children, particularly those under six years of age, should be placed in permanent homes "expeditiously."[13] OCS also noted that Jack had been under court orders to engage in a domestic violence intervention program in 2007, an alcohol safety program in 2011,

---

[11]     Throughout the relevant period Ned was placed with Karina's mother and stepfather, but Karina's father was seeking to change Ned's placement. Boeckman testified that both Karina's mother and father were supervising family contact.

[12]     Neither the motion nor Jack's reply mentioned the 36-week domestic violence intervention course OCS required, which Jack alleges was not available to him.

[13]     AS 47.05.065(5)(c).

and an anger management program in early 2014 as probation conditions for various crimes and that there was no evidence he attended any of these programs. In light of this history and of Ned's best interests and right to permanency, OCS argued that the court should not find good cause to continue the trial indefinitely when Jack asked the court to "trust that [he would] engage in and follow his case plan."

The GAL reviewed the "very significant issues" Jack would need to address before he could be considered as a placement for Ned: an increasingly violent criminal history, including domestic violence; mental health; and substance abuse. These interventions would take months or years, she argued, and the likelihood that he would make enough progress to provide a satisfactory home for Ned was remote. She argued the request for a continuance was unreasonable because "a short continuance will not offer [Jack] much more time to demonstrate any meaningful changes, and a long continuance is not in [Ned's] best interest."

E.    **Termination Trial**

The termination trial was held on April 12, 2016. Karina did not attend. Jack's attorney said that Jack had left a message the previous day saying he intended to be there. Nevertheless, Jack did not appear or call in to the trial before it concluded.

The superior court first addressed Jack's motion for a continuance, denying it for the reasons given by OCS and the GAL. Although the court understood Jack's arguments that he could not complete various elements of his case plan in jail, it did not find that to be good cause to continue. The trial therefore began as scheduled.

OCS called 12 witnesses. The caseworkers testified to the various actions they had taken, described above. Jack's attorney did not question the first caseworker and briefly questioned the other two on Jack's visitation with Ned. Jack's attorney also asked the second caseworker, Boeckman, when Boeckman had met with or contacted Jack and asked the third, Patton, what programs Jack had completed while incarcerated

and whether he had provided documentation of them. Her closing argument addressed "the lack of effort" by Boeckman between October 2014 and May 2015, when Boeckman did not visit Jack despite his being "a captive audience." She argued that, though "[s]ervices may be limited while he's [in pretrial]," OCS was not excused from attempting to contact him or develop the case plan with his input.

In closing, OCS asked the court to find that Ned was in need of aid due to abandonment under AS 47.10.011(1) and AS 47.10.013(a)(7) because Jack had failed to appear at the termination hearing.[14] Jack's attorney argued that he had participated throughout the case and that failing to appear at one hearing should not lead to an abandonment finding for failing to respond to notice of child protective proceedings. But the court asked what to make of Jack's absence. Jack's attorney ultimately said that she did not know and the court could "attach weight to it as the court [saw] fit." The court then granted OCS's request, saying that despite having requested extra time to engage just a few days before trial, Jack had not appeared or even called to explain his absence. These actions, or inactions, the court said, "[spoke] very loudly."

The court found by clear and convincing evidence that Ned had been subject to conditions listed in AS 47.10.011(1) (abandonment), (8) (exposure to domestic violence), (9) (neglect), and (10) (substance abuse) by both parents and that neither parent had remedied the conduct or conditions placing Ned at substantial risk of harm. The court also found that OCS had shown by clear and convincing evidence that it had made reasonable efforts under AS 47.10.086. Noting that Jack had been incarcerated for nearly all of OCS's involvement with the family, the court acknowledged Jack's

---

[14] OCS also continued to request child in need of aid findings under AS 47.10.011(8) (exposure to domestic violence), (9) (neglect), and (10) (substance abuse). OCS had earlier withdrawn the petition under AS 47.10.011(2) (incarceration) because Jack was no longer incarcerated at the time of trial.

argument about lack of contact by Boeckman but found OCS's efforts "appropriate" and "consistent." Looking at all of the efforts OCS had made with respect to both parents, the court found that OCS had "done all that the law requires." Finally, the court found that termination of both parents' rights was in Ned's best interests and ordered that Ned be committed to OCS's custody for the purpose of consent to adoption or other permanent placement.

Jack appeals the denial of his motion to continue and the court's finding that OCS made reasonable efforts to provide remedial services or reunite Jack with his son.

## III. STANDARD OF REVIEW

" 'We review a denial of a motion to continue for "abuse of discretion, determining whether a party has been deprived of a substantial right or seriously prejudiced by the lower court's ruling." ' 'We will consider "the particular facts and circumstances of each individual case to determine whether the denial was so unreasonable or so prejudicial as to amount to an abuse of discretion." ' "[15]

"Whether OCS has made reasonable reunification efforts is a mixed question of law and fact."[16] With mixed questions, "we review factual questions under the clearly erroneous standard and legal questions using our independent judgment."[17]

---

[15] *Rowan B. v. State, Dep't of Health & Soc. Servs.*, 361 P.3d 910, 912-13 (Alaska 2015) (first quoting *Hannah B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 289 P.3d 924, 930 (Alaska 2012); then quoting *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 259 (Alaska 1999)).

[16] *Sherman B. v. State, Dep't of Health & Soc. Servs.*, 310 P.3d 943, 949 (Alaska 2013) (citing *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 428 (Alaska 2012)).

[17] *Sherry R. v. State, Dep't of Health & Soc. Servs., Office of Children's*
(continued...)

"In CINA cases, we review issues that were not raised in the trial court for plain error."[18]

## IV.   DISCUSSION

Jack's statement of points on appeal raises five issues for review, but his brief discusses only two of them: that the superior court erred by denying his motion to continue the termination trial and that it erred by finding OCS had made reasonable efforts to reunite him with his child. The other three issues[19] have been abandoned because of Jack's failure to brief them.[20]

### A.   The Superior Court Did Not Abuse Its Discretion By Denying Jack's Motion To Continue The Termination Trial.

Once a petition to terminate parental rights has been filed in superior court, Alaska law requires the court to hold a trial on the petition within six months of filing "unless the court finds that good cause is shown for a continuance."[21] In determining whether there is good cause to continue, "the court shall take into consideration the age

---

[17]   (...continued)
*Servs.*, 332 P.3d 1268, 1274 (Alaska 2014) (quoting *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1018 (Alaska 2009)).

[18]   *Kyle S. v. State, Dep't of Health & Soc. Servs.*, 309 P.3d 1262, 1267 (Alaska 2013).

[19]   The statement of points on appeal also claimed that the superior court erred in finding by clear and convincing evidence that Ned was a child in need of aid, in finding there was clear and convincing evidence that Jack had not remedied the conduct or conditions that placed Ned at risk of harm, and in finding that the best interests of the child would be promoted by terminating Jack's parental rights.

[20]   *See Gates v. City of Tenakee Springs*, 822 P.2d 455, 460 (Alaska 1991) (treating claims "not addressed at all" in appellant's brief to this court "as having been abandoned" (citing *Lewis v. State*, 469 P.2d 689, 691-92 (Alaska 1970))).

[21]   AS 47.10.088(j).

of the child and the potential adverse effect that the delay may have on the child."²² To show that the superior court abused its discretion by denying the continuance, Jack must show that he was "deprived of a substantial right" or "seriously prejudiced" by the decision.²³ But in termination trials "the best interests of the child, not those of the parents, are paramount."²⁴

Jack argues that he was seriously prejudiced because OCS denied him "a meaningful opportunity" to work on his case plan. He points out that he was in custody for almost the entire CINA case and says that OCS never developed an appropriate case plan because his plan required him to access services that were unavailable in prison. It was "fundamentally unfair" to hold the trial when he was never given a case plan "he could complete while incarcerated," he argues, and the case plans OCS supplied were "meaningless" because they required outside services. There would have been no adverse effect on Ned, he claims, because Ned would have continued to live with Karina's mother and stepfather during the continuance.

But Jack's motion to continue did not raise these concerns. Jack instead discussed the programs he had completed while incarcerated and his efforts since his release. He said he had been unable to obtain a mental health assessment from DOC. And he requested a continuance to "allow [him] time to obtain the required assessment and to follow any recommendations." Neither his motion nor his reply stated or implied any deficiency in OCS's case planning or provision of services.

---

²²    *Id.*

²³    *Hannah B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 289 P.3d 924, 931 (Alaska 2012) (quoting *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1019 (Alaska 2009)).

²⁴    *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 260 (Alaska 1999).

Nor did OCS or Ned's GAL discern or respond to what Jack now argues on appeal. OCS's response focused on the harm to Ned from delaying permanency and Jack's failure to remedy the conduct and conditions that caused Ned to be in need of aid. It also argued that Jack had been required to complete domestic violence, substance abuse, and anger management programs as probation conditions but had not done so; nor had he addressed his long history of violence against women. The GAL's response also discussed Jack's history of violence and Ned's need for permanency in a safe and stable home. The GAL argued that the services Jack needed would "take months, if not years."[25] A short continuance, she argued, would "not offer [Jack] much more time to demonstrate any meaningful changes, and a long continuance is not in [Ned's] best interest."

Thus, Jack's argument on appeal that good cause existed because OCS's efforts toward Jack were inadequate was not before the superior court when it ruled on the motion. "We have held that, in general, 'a party may not . . . advance new theories to secure a reversal of a lower court decision.' "[26] Issues not raised at trial are reviewed

---

[25] Though Jack's motion mentioned only the need to complete a mental health and substance abuse assessment and follow resulting recommendations, Ned was also in need of aid due to domestic violence in the family under AS 47.10.011(8). To address this, Jack's case plan also included a 36-week domestic violence intervention course. A continuance long enough to allow Jack to show that he had "remedied the conduct or conditions in the home that place[d] the child at substantial risk of harm" under AS 47.10.088 would likely have delayed trial by at least eight months to a year, if not longer.

[26] *Anchorage Chrysler Ctr., Inc. v. DaimlerChrysler Motors Corp.*, 221 P.3d 977, 985 (Alaska 2009) (quoting *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1280 (Alaska 1985)).

for plain error in CINA cases.[27] To find plain error, we must first find that the superior court made an obvious mistake and then conclude that the mistake creates a high likelihood of injustice.[28]

The superior court's decision was necessarily made based on the facts and arguments before it at the time. The court was faced with a simple request for an indefinite continuance for Jack to engage in whatever services were recommended based on a mental health assessment, with no indication of how long that might take. This request included assertions that Jack was working on his case plan and was accompanied by evidence that he had successfully completed some relevant programs in prison. On the other side of the ledger were OCS's and the GAL's arguments that delaying permanency indefinitely would be contrary to Ned's best interests.[29]

The court applied AS 47.10.088(j), which requires the court to consider the age of the child and the potential adverse effects of delay. It recalled the Alaska Legislature's finding that an expedited placement procedure is important "to ensure that all children, *especially those under the age of six years . . . are placed in permanent homes expeditiously*."[30] And it noted that Ned was four years old, had been in OCS custody since age two, and needed permanency after a history of witnessing domestic

---

**27** *Kyle S. v. State, Dep't of Health & Soc. Servs.*, 309 P.3d 1262, 1267 (Alaska 2013); *see also David S. v. State, Dep't of Health & Soc. Servs.*, 270 P.3d 767, 778 (Alaska 2012) (holding that one of the appellant's arguments for why OCS failed to satisfy the Indian Child Welfare Act's active efforts requirement would be reviewed only for plain error because it was not advanced at trial).

**28** *Kyle S.*, 309 P.3d at 1267.

**29** Although the court apparently did not use it as a basis for its decision, the court was also faced with Jack's failure to appear at the termination proceeding itself.

**30** AS 47.05.065(5)(C) (emphasis in superior court order).

violence between his parents. Based on these facts and arguments, and because "[i]t is the best interests of the child which are paramount," the court found that there was not good cause to grant a continuance.[31] The court's decision was not an "obvious mistake" and therefore was not plain error.[32]

Jack did preserve for review his argument that he simply needed more time to access services that had been unavailable. We evaluate the superior court's decision for abuse of discretion, which is found in this context when "a party has been deprived of a substantial right or seriously prejudiced by the lower court's ruling."[33] We consider "the particular facts and circumstances of each individual case to determine whether the denial was so unreasonable or so prejudicial as to amount to an abuse of discretion."[34] Jack argues that he was seriously prejudiced by the denial because OCS did not give him a "meaningful opportunity" to work on his case plan. Though he does not make the connection explicitly, it seems likely that he means he was prejudiced by the denial because prior to the termination hearing he had been unable to access services that would allow him to remedy the conduct or conditions causing Ned to be in need of aid.

But OCS and the GAL made compelling arguments in response. The GAL pointed out that a short continuance would not have meaningfully helped Jack and that a long one would be harmful to Ned. In order for Jack to have been seriously prejudiced

---

[31]    *See* CINA Rule 1(c) ("These rules will be construed and applied to promote . . . the best interests of the child.").

[32]    *David S.*, 270 P.3d at 778.

[33]    *Rowan B. v. State, Dep't of Health & Soc. Servs.*, 361 P.3d 910, 912 (Alaska 2015) (quoting *Hannah B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 289 P.3d 924, 930 (Alaska 2012)).

[34]    *Id.* at 913 (quoting *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 259 (Alaska 1999)).

by the denial of the continuance, Jack would have to have been able to timely remedy the conduct causing Ned to be in need of aid. But a short continuance could not have given Jack enough time to receive the services he needed, in particular the 36-week domestic violence intervention program and whatever mental health or substance abuse services were recommended based on the screening. And both OCS and the GAL correctly observed that a long continuance would not be in Ned's best interests due to Ned's age and need for permanence. We have declined to find an abuse of discretion in similar circumstances and we find no abuse of discretion here.[35]

Because Jack was not prejudiced by denial of a short continuance, because Ned's best interests barred a long continuance, and because the best interests of the child are paramount, the superior court's decision was not "so unreasonable or so prejudicial as to amount to an abuse of discretion."[36] We therefore affirm the court's denial of Jack's motion to continue.

B. **The Superior Court Did Not Err In Finding That OCS Made Reasonable Efforts To Reunite Jack With Ned.**

To terminate parental rights, the superior court must find by clear and convincing evidence that the child is in need of aid under AS 47.10.011; that the parent has not remedied the conduct or conditions that place the child at substantial risk of harm or has failed to remedy them within a reasonable time; and that OCS has made

---

[35] *See Hannah B.*, 289 P.3d at 931-32 (holding that "the superior court had a strong basis to conclude that a few months of additional time would not have been sufficient for [the mother] to show that she had truly remedied her conduct" and that "a delay would not be in [the child's] best interests, given his age and the length of time he had spent out of the home").

[36] *Rowan B.*, 361 P.3d at 913 (quoting *A.A.*, 982 P.2d at 259).

reasonable efforts to enable the child's return to the home under AS 47.10.086.[37]  Of these findings,  Jack appeals only whether OCS made reasonable efforts.

Alaska Statute 47.10.086(a) requires OCS to "make timely, reasonable efforts to provide family support services to the child and to the parents . . . that are designed to . . . enable the safe return of the child to the family home."  This requirement includes the duty to identify services that will help the parent remedy the conduct or conditions that made the child in need of aid, to "actively offer" the parent such services, to refer the parent to those services, and to document these actions.[38]  In reviewing OCS's efforts, the court "considers the state's reunification efforts in their entirety."[39] The court "first identif[ies] the problem that caused the children to be in need of aid and then determine[s] whether OCS's efforts were reasonable in light of the surrounding circumstances."[40]  A parent's incarceration affects "the scope of OCS's duty to make reasonable efforts."[41]

The superior court's finding of reasonable efforts clearly relied on Jack's having been incarcerated for nearly the entire period of OCS involvement.  In response to Jack's argument that OCS "should have made a little bit more effort to go" to Cook Inlet Pretrial between October 2014 and May 2015 and "engage" Jack, the court found that OCS's efforts were "appropriate" and "consistent."  The court also relied on Karina's inaccessibility for much of the relevant period, saying that OCS attempted to

---

[37]     AS 47.10.088(a).

[38]     AS 47.10.086(a).

[39]     *Barbara P. v. State, Dep't of Health & Soc. Servs.*, 234 P.3d 1245, 1262 (Alaska 2010).

[40]     *Id.*

[41]     *Id.*

contact both parents, provide appropriate services, and follow up, but there was only so much it could do when a parent "do[es]n't show up" or provide a working phone number. The court ultimately concluded that OCS had "done all that the law requires."

Jack claims that OCS's efforts were unreasonable in two primary ways. He first argues that OCS did not comply with its own case plans, which required it to attempt to meet with Jack each month. Second, he argues that OCS failed in its duty to identify and actively offer appropriate services to him because the caseworkers did not research what services were available at the DOC facilities or identify outside providers who would work with him.

### 1. OCS's contact with Jack

Jack's first argument is that OCS did not meet with him frequently enough and failed to comply with the provision of the case plans requiring it to attempt to meet with him monthly. Both the November 2014 and the July 2015 case plans contained this provision. Despite this provision, Jack argues, OCS did not come close to attempting to meet with him each month. He points to meetings in October 2014, May 2015, July 2015, and March 2016, as well as phone conversations between November 2015 and March 2016.

Jack is correct that in-person meetings between himself and the caseworkers were sparse. Over the course of the approximately 20 months[42] of OCS involvement with the family prior to the termination trial, three caseworkers were assigned to the family. They testified about their contacts with the various members of the family and with Jack in particular. Keith met with Jack at Cook Inlet Pretrial in October 2014 before the case was transferred to family services. She also held a Team Decision

---

[42] OCS's first contact with Ned shortly followed the report received on August 30, 2014; the termination trial was held on April 12, 2016.

Making Meeting on October 20, which Jack attended telephonically. Boeckman sent Jack a letter with her contact information when she got the case in October 2014.[43] She attended the initial case conference with all the parties, including Jack, in early December 2014. There the parties discussed Ned's placement with Karina's mother and stepfather, which Jack and Karina were happy with; visitation and contact; verifying paternity; and probably the case plan. Boeckman sent Jack another letter with his case plan and NA/AA ledgers at the end of March 2015. And she met with Jack in person at the jail in May and July 2015. Patton first spoke with Jack over the phone in November 2015 and met him in person in March 2016 when Jack was released. Patton testified that they either had another meeting scheduled for April or he intended to schedule one.

This history shows that OCS met with Jack less frequently than its case plan intended. But we have never held that OCS's failure to comply with provisions of a case plan is per se unreasonable or that lack of contact, by itself, can make OCS's efforts unreasonable. Under the reasonable efforts standard OCS may leave some responsibility to the parent. For instance, with respect to the provision of services, OCS's duty is fulfilled if it sets out "the types of services" a parent should use "in a manner that allows the parent to utilize the services,"[44] though OCS must also make referrals to community-based services "whenever [they] are available and desired by the parent,"[45] as it did with Karina. We have never held that OCS bears all the responsibility for establishing

---

[43]    Boeckman testified that, though Jack had her contact information, he never contacted her between October 2014 and May 2015.

[44]    *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 77 P.3d 715, 720 (Alaska 2003).

[45]    AS 47.10.086(a)(2).

contact.[46] There is no evidence that Jack ever attempted to contact OCS about his case plan, even though he was sent Boeckman's contact information and the case plan and participated in the initial case conference with her where the plan seems to have been discussed. Nor has Jack alleged that he reached out but that OCS failed to respond.

OCS does not dispute that its contacts with Jack were less frequent than the case plan called for, instead arguing that its overall efforts towards Jack were reasonable, as were its efforts on the case as a whole. And when a parent is incarcerated, the scope of OCS's duty is affected.[47] We have held that "DOC rather than OCS has the primary responsibility of providing services" to an incarcerated parent.[48] Where OCS is not able to offer or provide additional services because of a parent's situation in pretrial detention, monthly meetings "to assist with referrals to services and assess [the] parent's progress towards achieving case plan goals" may be less important. OCS's infrequent contact with Jack was not perfect, but this does not render OCS's efforts unreasonable.

### 2. Support services

Jack's second argument is that the superior court's reasonable efforts finding was erroneous because OCS did not "identify and actively offer appropriate

---

[46] *See Sylvia L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 343 P.3d 425, 432 (Alaska 2015) ("The reasonableness of OCS's efforts may also depend on the parent's expressed interest in parenting, with OCS's responsibility lessening as the parent's interest wanes.").

[47] *Casey K. v. State, Dep't of Health & Soc. Servs.*, 311 P.3d 637, 646 (Alaska 2013) (citing *Barbara P. v. State, Dep't of Health & Soc. Servs.*, 234 P.3d 1245, 1262 (Alaska 2010)).

[48] *Id.* (citing *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 56 (Alaska 2003)).

family support services"[49] to him. It was unreasonable, Jack says, for the OCS case plans to require him to complete a 36-week domestic violence course at a location that he could not access while incarcerated. But Jack did not raise or dispute at trial what efforts OCS actually made to identify appropriate services or whether OCS's case planning and provision of services were reasonable.[50] To the extent Jack raised the issue of services provided, he focused not on what he was unable to do but on what he successfully accomplished: all seven of his exhibits consisted of proof that he had completed programs while incarcerated, including the Inside Out Dads program OCS recommended in his case plan.

Because Jack did not raise this argument about OCS's efforts in superior court, we review it for plain error. Again, "[p]lain error exists 'where an obvious mistake has been made which creates a high likelihood that injustice has resulted.' "[51] The superior court remarked that Jack had been incarcerated for essentially the entire case and found that OCS's efforts with respect to Jack were "appropriate" and "consistent." The record before the court indicated that OCS had recommended Inside

---

[49]    *Jeff C. v. State*, 117 P.3d 697, 706 (Alaska 2005) (citing AS 47.10.086(a)(1)-(2)).

[50]    As part of his argument, Jack also claims that OCS had a duty to "identify outside providers who would work with a client in prison" if appropriate services were not available through DOC. This purported duty was not raised at trial and, like the rest of this argument, was not preserved for appeal. And on appeal Jack simply asserts that OCS has such a duty without citing any authority. We will not consider this argument. *See Wright v. Anding*, 390 P.3d 1162, 1174-75 (Alaska 2017).

[51]    *David S. v. State, Dep't of Health & Soc. Servs.*, 270 P.3d 767, 778 (Alaska 2012) (quoting *D.J. v. P.C.*, 36 P.3d 663, 668 (Alaska 2001)).

Out Dads to Jack "in a manner that allow[ed him] to utilize" it.[52] The record contained Boeckman's unchallenged testimony that incarcerated parents in pretrial status "have limited access to services." Both Boeckman and Patton testified that they had spoken with Jack about what he could do to work on his case plan while he was in jail. And in cross-examining Patton, Jack's attorney emphasized the programs Jack had successfully completed while incarcerated. Once Jack left pretrial status and was transferred to Spring Creek in August 2015 to serve the remainder of his sentence, a little more than six months was left until his expected release date, leaving a relatively short window for him to enroll in and complete services with DOC. With these facts and arguments before the superior court, the court did not clearly err in concluding that OCS did what it could to recommend the services Jack needed within the constraints of his incarceration, despite the acknowledged fact that Jack's case plan called for services that were impossible for him to access in prison.

### 3.    Reasonableness overall

In determining whether OCS made reasonable efforts, the superior court had to consider "the state's reunification efforts in their entirety."[53] OCS argued at trial that it was reasonable to focus on assisting and trying to reach Karina, the non-incarcerated parent, while Jack remained in pretrial status with limited access to services. We have held in the Indian Child Welfare Act context that "efforts toward a non-incarcerated parent are important because if the children are able to stay with the non-

---

[52]    *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 77 P.3d 715, 720 (Alaska 2003).

[53]    *Barbara P. v. State, Dep't of Health & Soc. Servs.*, 234 P.3d 1245, 1262 (Alaska 2010) (citing *Frank E.*, 77 P.3d at 720).

incarcerated parent, it is unlikely the incarcerated parent's rights will be terminated."[54] At the Team Decision Making Meeting in October 2014 Jack evidently said he would be released within four to six months after that meeting, and this appears to be the information OCS had when writing the first case plan a month later. So it was not unreasonable for OCS to include services in the case plan for Jack that were directed to time when he was incarcerated and time when he was not. Because Karina was not incarcerated and OCS had more opportunity to help her, with more control over what services could be provided to her and more ability to facilitate them, it was also not unreasonable for OCS to focus its initial efforts on her.

OCS took a number of actions focused on helping Karina in the initial months of the case. As the non-incarcerated parent, she could resume caring for Ned at any point if she remedied the conduct putting him at risk. In March 2015 Karina began to miss more visits with Ned. At the same time a treatment provider notified OCS that it had not been able to reach her either and therefore would not provide services to her. At this point the caseworker seems to have moved her focus to Jack. She mailed him the case plan and NA/AA ledgers and set up an in-person meeting. At their meeting they discussed what Jack could do in jail and Jack's desire to have visitation with Ned. The caseworker ensured visitation began the following month and shortly thereafter updated the case plan.

---

[54]     *Claudio P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 309 P.3d 860, 866 (Alaska 2013) (quoting *Doe v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 272 P.3d 1014, 1021 (Alaska 2012)). *See also Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 849-50 (Alaska 2009) (affirming the superior court's finding of active efforts to reunify an Indian family towards an incarcerated father where the court found OCS's efforts "were heavily oriented towards the [non-incarcerated] mother").

Jack's case plans identified several services that would help him remedy the issues affecting Ned: Inside Out Dads, to complete while he was incarcerated; a 36-week domestic violence intervention course at one of two providers; a mental health assessment with any necessary follow-up treatment; and an approved parenting program like Father's Journey. DOC programs are also considered part of State efforts for these purposes.[55] While Jack was incarcerated DOC provided him with anger management programs and a number of job training opportunities, of which he took advantage. Though sobriety was not addressed in his case plan, Jack had admitted to some drug use in the past, and OCS sent him NA/AA ledgers to help track his sobriety, which he did not return. DOC also provided some drug-related services, including a substance abuse screening after his transfer to Spring Creek and drug testing. The screening recommended a follow-up assessment; the record does not indicate that Jack ever participated in any such assessment or why he did not do so.

OCS's efforts were not perfect, but they were reasonable.[56] "OCS's efforts must be evaluated in light of the circumstances of each particular case, including the parent's actions or inaction,"[57] and "must be viewed in light of the entire history of services that the state had already provided."[58] The circumstances of the case include the

---

[55] *Dashiell R.*, 222 P.3d at 849 (citing *Frank E.*, 77 P.3d at 720-21; *T.F. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 26 P.3d 1089, 1096 (Alaska 2001)).

[56] *See Audrey H. v. State, Office of Children's Servs.*, 188 P.3d 668, 681 (Alaska 2008) ("Although OCS's efforts were not perfect, they were reasonable . . . .").

[57] *Id.* at 678.

[58] *Id.* (quoting *Erica A. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 66 P.3d 1, 7-8 (Alaska 2003)).

incarceration of the parent, and the history of services includes services provided by DOC.[59] The superior court did not err in finding that OCS made reasonable efforts.

## V.    CONCLUSION

We AFFIRM the superior court's decision to deny Jack's motion for a continuance of the termination trial and its finding that OCS's efforts were reasonable.

---

[59]    *Dashiell R.*, 222 P.3d at 849 (first citing *Frank E.*, 77 P.3d at 720-21; then citing *A.M. v. State*, 891 P.2d 815, 827 (Alaska 1995); *T.F.*, 26 P.3d at 1096).